PIERRE S. DUPONT,

*vs.*

WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, and HENRY B. ROBERTSON, Executor under the Last Will and Testament of Alice Belin duPont, Deceased.

WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, Executor under the Last Will and Testament of Alice Belin duPont, Deceased,

Cross Complainant,

*vs.*

PIERRE S. DUPONT,

Cross Defendant.

*New Castle, January 16, 1946.*

*Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, (Charles H. McCarthy, of Washington, D.C., of counsel), for complainant.

*Caleb S. Layton* and *Charles F. Richards,* of the firm of Richards, Layton & Finger, for defendant and cross-complainant.

HARRINGTON, Chancellor: Pierre S. duPont seeks to enforce a contract made with Alice Belin duPont, his wife, dated November 3, 1938, relating to the disposition of the proceeds of the sale of a certain annuity contract, dated May 31, 1924.

Wilmington Trust Company, the executor of Mrs. duPont's estate, by a cross bill, also seeks certain affirmative

relief against the original complainant.

This court has jurisdiction on two grounds:

(1) The contract is between husband and wife (*Spruance v. Equitable Trust Co.*, 12 *Del.Ch.* 12, 103 *A.* 577; *Peters v. Peters*, 20 *Del.Ch.* 28, 169 *A.* 298; *Masten v. Herring, Masten's Ex'r.*, 6 *Pennewill* 282, 66 *A.* 368; *Plotkin v. Plotkin*, 2 *W. W. Harr.* (32 *Del.*) 455, 125 *A.* 455; and (2) the specific performance of that contract is sought, or, in the alternative, the complainant seeks a decree impressing certain property, in the possession of the defendant executor, with a trust.

On May 31, 1924, Delaware Realty and Investment Company, in consideration of the payment of $13,500,000, granted to Pierre S. duPont and Alice Belin duPont an annuity of $900,000. The entire consideration was paid by Pierre S. duPont, but Alice Belin duPont, his wife, joined in the conveyance to Delaware Realty and Investment Company of certain real estate, belonging to Mr. duPont, of the approximate value of $700,000, in order to secure a portion of the agreed consideration, and thereby released her right of dower in that property.

The contract provided for the payment of the annuity "to the said Pierre S. duPont annually during the term of his life and after his death to the said Alice Belin duPont annually during the term of her life if she would survive the said Pierre S. duPont." It also gave the annuitants, or the survivor of them, the right "to cancel this contract and enforce the repayment to the said Pierre S. duPont, if he be then living, or to the said Alice Belin duPont, if the said Pierre S. duPont be then deceased, of the then value of the said annuity * * *." Somewhat similar language also appeared in a later provision of the contract. A schedule of values was also attached in the case of default.

Some time in 1937, because of changes in the federal income tax laws, Mr. duPont was advised to consider a sale

of the annuity contract, and on November 3, 1938, after some negotiations relative thereto, sold it, with all rights in connection therewith, to Empire State Corporation, a Delaware corporation, for $9,000,000. Mrs. duPont also executed the assignment. Pursuant to contract provision, $500,000 of that sum was immediately paid in cash, and the remaining $8,500,000 was secured by serial promissory notes of the Empire State Corporation, bearing rates of interest varying from 1½% to 3½%, and maturing quarterly on the first days of March, June, September and December in each year, in blocks of $150,000. The final payment of $250,000 was, however, due December 1, 1952. These notes were issued pursuant to a collateral trust agreement between Empire State Corporation and Wilmington Trust Company, dated November 1, 1938, and the payment thereof was originally secured by a deposit of 34,000 shares of General Motors Corporation common stock, as well as by an assignment of the annuity contract itself. Pursuant to that agreement, all of the General Motors stock was withdrawn during the first four years after its execution. At and prior to the time of the sale of the annuity contract, a problem was presented, with respect to the disposition of the proceeds of the sale, and Pepper, Bodine, Stokes and Schoch, a Philadelphia law firm, was consulted with respect to the matter. On November 2, 1938, George Wharton Pepper, of that firm, wrote Mr. duPont that the determination of Mrs. duPont's interest in the annuity had turned out to be "a more difficult process" than he "had supposed." After stating that various computations resulted in varying values of Mrs. duPont's interest, ranging from 10% to 30% of the whole, Senator Pepper stated:

(1) "It seems to us on the whole desirable to use the table which is the basis of current government calculations;" and

(2) "Since, however, there is no way of committing the government and no way of now ascertaining absolute and permanent percentages, we had prepared a form of agreement to be entered into by you and Mrs. duPont, based on current government practice but

containing a provision for the substitution hereafter of such other standard as in the interval the government might adopt. A rough draft of this agreement (which was prepared before the arrival of your letter) is enclosed for your information."

Mr. duPont was then in approximately a 33% federal gift tax bracket and Mrs. duPont would be in practically the same bracket if she made a substantial gift to Mr. du-Pont.

The contract referred to in Senator Pepper's letter, of November 2, 1938, was executed by Pierre S. duPont and Alice Belin duPont on November 3, 1938. It was as follows:

"Whereas, Pierre S. duPont and Alice Belin duPont, his wife, have, this day, November 3, 1938, entered into a contract with the Empire State Corporation for the sale of their interests in a certain annuity contract; and

"Whereas, Pierre S. duPont and Alice Belin duPont each have a specific vested interest in the said annuity contract, and each is, therefore, entitled to receive such shares of the proceeds of the sale as may be determined by reference to mortality tables; and

"Whereas, there is no intention upon the part of either Pierre S. duPont or Alice Belin duPont that any gift or donation is to be made by either to the other, the intention being that the proceeds are to be divided on the basis of the relative values of their respective interests in the annuity contract as so determined,

"Now, therefore, Pierre S. duPont and Alice Belin duPont agree that the proceeds of the said sale to the Empire State Corporation shall be divided between them in the proportion of 75% to Pierre S. duPont and 25% to Alice Belin duPont. These percentages have been determined by reference to Wolf's Inheritance Tax Calculations Table No. 25. If it should be authoritatively decided that the value of either party's interest was in excess of, or less than, the percentage computed above, the percentage as thus calculated shall be substituted for the percentage above set forth, and the person who has received an excess amount shall be, by this instrument, legally bound to pay over to the other party the portion of the proceeds to which the latter party would be entitled under such authoritative calculation."

The annuity contract was assigned and transferred to the Empire State Corporation on November 4, 1938, and the accompanying collateral trust agreement was apparently executed on December 19, 1938, as it was acknowledged by

Alfred E. Smith, president of Empire State Corporation on that date, but it was executed as of November 1, 1938. Mr. duPont had copies made of the November 3 contract, and by letter dated November 10, 1938, returned a copy to George Wharton Pepper. In that letter, he stated:

"You will note that the division 75-25, is tentative, subject to future authoritative decision.

"When we have finally decided our opinion on the subject, it can be taken to Washington and reviewed or reported in tentative manner and decision from the Tax Office forced before final action is taken."

Mrs. duPont was first given a check for $125,000 (one-fourth of the initial cash payment made by the Empire State Corporation) and a temporary note for $2,125,000. Definitive notes were subsequently executed and delivered to both Mr. and Mrs. duPont. On December 30, 1938, Mrs. duPont wrote Mr. duPont:

"I did not understand that I might retain my residuary rights in the entire proceeds, as this was my position under my contract. I prefer to accept this position and I now understand that Mr. Pepper will give an opinion on this point, which appeals to me as the proper disposition in the matter. I am therefore returning my check for $125,000 and the note for $2,125,000 which you handed to me."

In the spring of 1939, federal income tax returns had to be prepared for both Mr. and Mrs. duPont. Mr. Gerald Montaigne, who prepared them, realized that definitive figures, on some mathematical basis, would be necessary in apportioning the proceeds of the sale of the annuity contract, and on March 1, 1939, made a "rule of thumb" calculation, largely based on Mr. and Mrs. duPont's respective life expectancies. The figures arrived at were included in the tax returns filed for the years 1938 and 1939, and were 75.84% to Mr. duPont and 24.16% to Mrs. duPont. No attempt was made to compute these percentages according to actuarial calculations. Based on the Montaigne figures Mr. duPont reported, among other income items, for the year 1938 a long term capital gain from the sale of the annuity contract of $682,064, and Mrs. duPont reported $10,000

from the same source. For the year 1939, each reported as taxable income, the interest received by them from the Empire State Corporation notes during that year.

On March 17, 1939, Mr. duPont wrote White & Case, a New York law firm:

"Mrs. duPont and I have finally decided upon a division of the proceeds from the sale of annuity contracts with Delaware Realty and Investment Company on the basis of 75.84% to me and 24.16% to Mrs. duPont. We propose that the notes shall be issued 75% to me and 25% to Mrs. duPont and the adjustment will be made in cash. Will you please proceed to issue definitive notes on this basis."

On December 29, 1939, the account books of Pierre S. duPont and Alice Belin duPont were adjusted to correspond with these figures and with the Montaigne calculation inserted in their income tax reports. The changes related to their respective shares both in the initial cash payment by Empire State Corporation and in the notes executed by it. Mrs. duPont's account was accordingly credited with an original cash payment of $120,800 instead of $125,000, as first entered.

On December 28, 1939, Mr. duPont gave Mrs. duPont a check for $117,698.22 which represented the adjusted amount less $3,101.78 which she owed him in other transactions. The reduction in the amount of the notes originally allocated to Mrs. duPont amounted to $3600. Mr. duPont's income tax returns for the year 1938, 1939 and 1940 were reviewed by the Internal Revenue Department in 1941 and the examining officer ruled that the entire proceeds received from the sale of the annuity contract was his property and that all capital gains in respect thereof were taxable to him accordingly. Prior notice might have been given but the examiner's report, dated August 20th, 1941, among other things, stated:

"In 1924 when the annuity contract was acquired several sections of real estate consisting of approximately 870 acres with numerous buildings thereon having an aggregated cost to taxpayers of $2,950,007.19

was transferred to Delaware Realty Co. together with large blocks of stock making up the balance of the purchase price of the annuity.

"Mrs. duPont had only a contingent interest in the annuity contract, namely, right of survivorship. During the period 6/1/1924 to October 1, 1938 the monthly payments of $75,000.00 were to Mr. duPont and Mrs. duPont received nothing over that period.

"It would appear that whatever interest she had in the real estate transferred in 1924 (by way of dower) was surrendered at that time and the contingent interest does not give her legal rights in the ownership of the annuity contract assigned to Empire State Corporation. Accordingly, the total receipts from the assignment of the annuity is considered income to Mr. duPont."

On the same day, August 20th, 1941, an over-assessment letter was sent to Alice Belin duPont in which she was offered a refund on account of income taxes for the years 1938 and 1939. The examiner stated:

"The over-assessments result primarily from transferring gain from sale of annuity for the year 1938 and interest on notes received from the sale for 1939 to report on Pierre S. duPont. Since it is considered that the annuity was his property.

"Changes were discussed with Mr. Ralph T. Ellis representing taxpayer who does not agree herewith, since the issue in the related case of Mr. duPont will be protested."

A few days after the receipt of the examiner's report Mr. duPont changed his will and bequeathed to Mrs. duPont an income of $600,000 annually, clear of taxes, to be paid out of the income from his estate, and if that should not be sufficient to be paid from the capital. Pursuant to the examiner's ruling, considerable additional income taxes were assessed against Pierre S. duPont for the years 1938 and 1939 because of (1) the increased capital gain chargeable to him from the sale of the annuity, and (2) the interest received by Mrs. duPont on the Empire State notes in 1939, which was also held to be assessable to him. Mr. duPont protested against the ruling of the examiner by letter dated October 17, 1941. An amended protest, covering various tax assessments during the years 1936 to 1940 inclusive was filed on January 16, 1942, and fourteen assignments of error

were relied on. They included claims for the deduction of various expenses and for considerable losses in 1939 and 1940 by reason of numerous short sales, and further "that he had made a gift to his wife on May 31, 1924 of an irrevocable vested interest in said annuity." The protest also dealt with alleged values of the respective interests of Mr. and Mrs. duPont as of May 31, 1924, the date of the annuity contract, and as of November 3, 1938, the date of its sale.

Mrs. duPont was not a party to the protest and was not present at any of the conferences with the revenue agents.

The various contentions made by Mr. duPont were heard by representatives of the Bureau of Internal Revenue at a conference in Wilmington on January 26, 1942 with the agent who had originally examined his tax return and a conferee from the Baltimore office; and later at a conference in Washington, on April 7th of that year. The latter hearing was before Mr. Paul Cain, head of the technical staff of the Atlantic Division of the Bureau of Internal Revenue, and four associates, at least two of whom were lawyers. Mr. duPont's claim, with respect to the ownership of the proceeds of the sale of the annuity was rejected at the Wilmington conference, and the examiner's original report was adhered to; although no additional written report was made. Mr. Barton, one of Mr. duPont's attorneys at the Wilmington conference, testified that the Government conferees "just sort of threw up their hands, it was such a big proposition, and said they would stand on the report and send it to Washington." Mr. Barton, Mr. duPont and Mr. Montaigne were at the Washington conference. Mr. Barton stated that notwithstanding the contention made on behalf of Mr. duPont at that conference, Mr. Cain and his associates were adamant in standing on the proposition that "all of it (the proceeds of the sale of the annuity) belonged to Mr. duPont and none of it to Mrs. duPont," and that the discussion was pretty well foreclosed on that issue; that

the reasons assigned were that no donative intent was manifested by Mr. duPont in 1924, and that this was evidenced by the fact that Mrs. duPont would never receive any part of the annuity unless she survived her husband. The fact that Mr. duPont had paid the entire consideration for the annuity was mentioned. Mr. duPont also testified that Mr. Cain adhered to the decision of the examiner. Mr. Montaigne's testimony was substantially to the same effect. He stated that the government tax officers "refused to vacate the report of the examiner" with respect to the annuity. Other questions involved in the protest filed related to even larger sums of money and were compromised with the government agents, but Mr. Barton testified that the compromise did not include the annuity question.

On April 9, 1942, or two days after the Washington hearing, Pierre S. duPont wrote Mr. Cain, as head of the technical staff of the Atlantic Division, stating, among other things:

"Confirming the understanding reached with you and your associates at a conference held in your office on April 7, 1942, on my protest dated January 17, 1942, for the years 1936-1940, I hereby make the following offer of settlement of my income tax liability for the years 1929 and 1935-1940 inclusive."

After referring to numerous items, some of which were to be allowed and others to be disallowed, the letter stated:

"The Commissioner to disallow the various contentions made by me relative to my sale of the annuity contract to the Delaware Realty and Investment Company (evidently meaning to Empire State Corporation) in November 1938."

The Commissioner was to allow as deductions nearly $8,000,000 growing out of short sales in 1939 and nearly $13,000,000 from similar transactions in 1940. Other claims for deductions discussed at the conference, were also mentioned. The letter concluded with the statement:

"This offer is made as a compromise and it is not intended that it shall be binding upon the Commissioner or myself except for the

years 1929 and 1935-1940, inclusive; and further that it shall not be binding for said years 1929 and 1935-1940, inclusive, unless my offer is accepted by or on behalf of the Commissioner."

By letter of May 29, 1942, Mr. Cain wrote Mr. duPont: "You are advised that the proposal submitted by you has been accepted on behalf of the Commissioner." A "Statement on Basis of Proposal for Settlement Without Litigation" was attached to the letter. It stated, among other things: "For settlement purposes the net income shown in the Revenue Agent's Report is adjusted as follows: * * *"; and, after correcting certain errors in the examiner's figures, all of the proceeds of the sale of the annuity contract were allotted to Mr. duPont for taxation purposes. It seems unnecessary to set out in detail that statement, but it apparently covered the same matters referred to in Mr. du-Pont's letter.

By reason of the assessment to Mr. duPont of the entire gain on the sale of the annuity, he paid $326,160.00 additional income taxes for the year 1938 and $23,049.93 for the year 1939. The latter assessment was based on the interest of the Empire State notes that had been paid to Mrs. du-Pont that year. The precise dates of the additional tax payments by Mr. duPont were not called to my attention.

Pursuant to the notice received from the tax office on August 20th, 1941, Mrs. duPont ultimately applied for refunds and was paid $1567.84 and $19,702.65 for the years 1938 and 1939 respectively. This request was not made, however, until the latter part of June 1942. Beginning with the year 1939, and continuing to the date of her death, June 23rd, 1944, Mrs. duPont received the proceeds from the Empire State notes, as they matured, amounting to the principal sum of $770,000. She also received the interest on those notes and the interest on the other Empire State notes which had been allotted to her in 1939 but were not due. Mrs. duPont at first deposited all capital and interest payments made by Empire State Cor-

poration in her general account, but on January 31st, 1940 she transferred all of the prior capital payments to a special account in the Wilmington Trust Company. The initial special deposit was $278,800, but at the time of her death the total deposits to that account had amounted to $890,-800. On June 15, 1943, Mrs. duPont lent Mr. duPont $600,-000 from that fund on a note secured by adequate collateral. The interest payments on the Empire State notes from 1939 to June 23rd, 1944, the date of Mrs. duPont's death, amounting to $160,612.50, apparently were used for her own purposes. Since 1940, joint income tax returns were filed by Mr. and Mrs. duPont, and Mr. duPont paid the taxes on all interest received by his wife on the Empire State notes. It does not appear that any gift tax returns were ever filed by Mr. duPont.

The contract of November 3, 1938, which the complainant seeks to enforce against the executor of Mrs. duPont's estate, contains three preliminary recitals:

(1) That Pierre S. duPont and Alice Belin duPont, his wife, have entered into a contract "for the sale of their interests in a certain annuity contract;"

(2) That "each have a specific vested interest in the said annuity contract and each is, therefore, entitled to receive such shares of the proceeds of the sale as may be determined by reference to mortality tables"; and

(3) That "there is no intention * * * that any gift or donation is to be made by either to the other, the intention being that the proceeds are to be divided on the basis of the relative values of their respective interests in the annuity contract as so determined."

The parties then agree: (1) That "the proceeds of the said sale to the Empire State Corporation shall be divided between them in the proportion of 75% to Pierre S. duPont and 25% to Alice Belin duPont, and refer to the mathematical table used in determining those figures; and (2) "If it

should be authoritatively decided that the value of either party's interest was in excess of, or less than, the percentage computed above, the percentage as thus calculated shall be substituted for the percentage above set forth, and the person who has received an excess amount shall be * * * legally bound to pay over to the other party the portion of the proceeds to which the latter party would be entitled under such authoritative calculation."

The Wilmington Trust Company, as executor of Alice Belin duPont, points out, among other things, that Pierre S. duPont, the complainant, not only conceded in the November 3rd contract that Mrs. duPont had a vested interest in the proceeds of the sale of the annuity contract, but at least tentatively agreed how they should be divided. It claims that the contracting parties could not have intended that a decision by a mere government agency should finally determine the proper division of that fund, and if it were their intent there was no such determination by the Commissioner of Internal Revenue, and this court must determine the question; that in so doing the tentative figures with respect to Mrs. duPont's interest are controlling unless other figures, substituted therefor, are based on some mathematical calculation, as provided by the contract, or are changed by the consent of the parties; that the evidence indicates it was agreed during Mrs. duPont's lifetime that her interest in the entire proceeds was 24.16% instead of 25%, as at first tentatively agreed on; that the controversy was settled on that basis, and the complainant's bill should be dismissed.

In support of its cross bill, the defendant claims that in any event the only evidence in the record applicable to Mrs. duPont's interest is either the testimony of Mr. Ammerman or of Mr. Armentrout; that based on the attained ages of the parties as of November 1938, Mr. Armentrout, using the Actuaries and Combined Experience Table (the table required by the Gift Tax Regulations), with an annual interest rate of 4%, estimated Mrs. duPont's interest to be

26.43% of the total amount, or $2,378,700. On the other hand, Mr. Ammerman, the complainant's witness, using the same table and interest rate, testified that Mrs. duPont's interest was 27.32% of the entire proceeds, or $2,458,800. The defendant, as executor of Alice Belin duPont, therefore, claims that it is entitled to a decree against the complainant for the difference between the amount paid Mrs. duPont and the amount actually due her.

When the agreement was made the annuity contract of May 31, 1924, was being sold for $9,000,000, payable partly in cash and partly in secured serial notes, the last of which was due in December, 1952. It seems that there was a long term capital gain on the scale of a little more than $692,000 which had to be accounted for as income by either, or both, of the contracting parties, depending upon their respective interests in the proceeds. Mrs. duPont had an unquestioned interest of some nature in the annuity contract and both parties to the November 3rd, 1938 contract assumed that she had an interest in the proceeds of the sale made during Mr. duPont's lifetime, and that the Internal Revenue Department would so hold; but there was no agreed valuation of her interest and they knew of no applicable mortality tables in general use, or what standard the tax authorities would use in determining it.

The federal gift tax statute of 1924, 26 *U.S.C.A. Int.Rev.Acts, page* 79 *et seq.,* did not become effective until June 2nd of that year and did not apply to a gift made on May 31st, 1924, though in terms it was retroactive during that year. See *Untermeyer v. Anderson,* 276 *U.S.* 440, 48 *S. Ct.* 353, 72 *L. Ed.* 645; *Blodgett v. Holden,* 275 *U.S.* 142, 276 *U.S.* 594, 48 *S.Ct.* 105, 72 *L.Ed.* 206. In these circumstances, a proper allocation of the proceeds of the sale of the annuity was extremely important in order to prevent the possibility of a claim that one had made a gift to the other since June 2, 1924, and the assessment of taxes accordingly.

By their contract of November 3, 1938, the parties

sought to bring about a nontaxable division or disposition of the fund by an authoritative determination of their rights before any final action should be taken, and the allocation of 75% to Mr. duPont and 25% to Mrs. duPont was intended to be merely tentative. The proper return of income taxes, based on the gain on the sale of the annuity contract necessarily had a direct bearing on that question, and primarily a decision by the proper federal tax authorities was intended by the contracting parties. In that event, the usual right of appeal from any such decision would necessarily follow in the manner prescribed by law.

Senator Pepper's letter of November 2, 1938, in which he enclosed a draft of the November 3rd contract, and Mr. duPont's letter of November 10th are pertinent circumstances that may be considered to aid the court in determining this question. Senator Pepper described the reallocation covenant as "a provision for the substitution hereafter of such other standard as in the interval the Government might adopt." In Mr. duPont's reply, in which he returned a copy of the executed contract, he said: "When we have finally decided our opinion on the subject, it can be taken to Washington and reviewed or reported in tentative manner and decision from the Tax Office forced before final action is taken."

In most cases, it may be said that the intent of the parties must be ascertained from the language of the contract itself when read as a whole, but pertinent explanatory circumstances may also be considered when the contract is in any sense ambiguous and uncertain in its meaning. *Radio Corp. of America v. Philadelphia Storage Battery Co.*, 23 Del.Ch. 289, 6 A.2d 329; *Colvocoresses v. W. S. Wasserman Co.*, 8 W. W. Harr. (38 Del.) 253, 190 A. 607; *Id.*, 9 W. W. Harr. (39 Del.) 71, 196 A. 181.

Should there be no ruling by the Tax Commissioner's office, a decision by a court of competent jurisdiction would

be required before any final allocation of the proceeds of the sale would be made.

But there was no determination of the rights of the parties by the federal tax officers.

When Pierre S. duPont and Alice Belin duPont filed their income tax reports for the year 1938 in March of 1939 a certain portion of the gain arising from the sale of the annuity contract was allotted to each of them, not, however, on a 75% and 25% basis, as tentatively fixed by their prior contract of November 3rd, 1938, but on the basis of 75.84% to Mr. duPont and 24.16% to Mrs. duPont. The reasons given for the use of these percentages appear in the facts, and will not be reiterated here, but they were merely tentative figures and were not intended to be final and binding on the parties unless the tax officers should approve them.

By the provisions of the *Internal Revenue Code* (26 *U.S.C.A. Int.Rev.Code* § 3640) the Commissioner of Internal Revenue "is authorized and required to make the inquiries, determinations, and assessments of all taxes and penalties imposed by this title * * *."

*Section 57* of the *Code, 26 U.S.C.A.Int.Rev.Code,* § 57, provides:

"As soon as practicable after the return is filed the Commissioner shall examine it and shall determine the correct amount of the tax."

But he necessarily acts through agents, and the regulations with respect to the persons exercising this authority provide for various staff divisions. The Atlantic Division includes the office at Baltimore and the branch at Wilmington, Delaware. The personnel of each staff division consists of a head and an assistant head, together with counsel, advisers, attorneys, auditors, clerks, etc.

Paragraph 2(a) of the regulations provides in part;

"The Head of each Staff Division will exclusively represent the

Commissioner in the determination of Federal Income—profits—, estates—, and gift tax liability (whether before or after the issuance of statutory notice of deficiency) in all cases originating in the office of any Internal Revenue Agent in Charge situated within the territorial jurisdiction of the Division in which the taxpayers have finally protested the preliminary determination of liability made by that officer * * *."

When a protest against an examiner's ruling is filed by a taxpayer the Technical Staff is in the nature of an appellate agency within the Bureau of Internal Revenue itself. It is an independent organization, as it were, in the Commissioner's office and performs its work under his supervision. *Com. Clearing House "Tax Court Service" Procedure Tech. Staff Div.; Report No.* 101 *June* 18, 1945, *p.* 3010. Moreover, it has the authority to finally settle practically all tax matters with the jurisdiction of the Commissioner. *Id.*

The action of the examiner in reviewing the tax reports of Mr. and Mrs. duPont was the first step taken on behalf of the Commissioner of Internal Revenue, and his ruling and the tax assessments based thereon were adhered to at the Wilmington conference after Mr. duPont's protest had been filed. Mr. duPont was still dissatisfied with that ruling and took the question to the higher agency of the Commissioner's office; but when the entire record is considered it is difficult to escape the conclusion that, whatever the opinion of Mr. Cain and his associates might have been on the annuity question, that problem and various controverted tax questions in other years were settled by a compromise and without any definite ruling by or on behalf of the Commissioner of Internal Revenue. Any other conclusion would be wholly inconsistent with the correspondence between Mr. duPont and Mr. Cain, the Head of the Technical Staff, for the Atlantic Division. Mr. Cain did not testify at the hearing in this case, and the testimony given by the witnesses present at the various conferences was objected to on the ground that it violated the hearsay

evidence rule. That objection was overruled and the evidence offered was admitted on the ground that the complainant merely sought to show what ruling Mr. Cain had made and the reasons given therefor; that he sustained the report of the examining agent holding that all of the proceeds of the sale in 1938, and, therefore, the gain incident thereto, as well as all of the interest received on the Empire State notes in 1939, belonged to Mr. duPont and were taxable to him. The defendant now concedes that that testimony tended to prove a constituent fact, in the nature of a verbal act, and was admissible. *Tompkins' The Chamberlayne Trial Evidence*, (2nd ed.) 1936, 766; 6 *Wigmore on Evid.*, (3rd ed.) 177; *Smith v. Whittier, et al.*, 95 *Cal.* 279, 30 *P.* 529; *State v. Wentworth, et al.*, 37 *N. H.* 196, 197.

In Mr. duPont's letter of April 9, 1942, to Mr. Cain he stated that his contention with respect to the annuity was to be rejected, though other and more important claims detailed by him were to be allowed. The letter was, however, in the form of an offer to compromise the pending questions, including one involving an assessment for 1929, which does not seem to have been inserted in the tax protest, and was accepted by Mr. Cain as such. As we have seen, the concluding sentence of Mr. duPont's letter was:

"This offer is made as a compromise and it is not intended that it should be binding upon the Commissioner or myself except for the years 1929 and 1935-1940, inclusive; and further that it shall not be binding for said years 1929 and 1935-1940, inclusive, unless my offer is accepted by or on behalf of the Commissioner."

Mr. Cain, by letter of May 9th, 1942, replied, "Accepted on behalf of the Commissioner." He also attached to that letter a "Statement on Basis of Proposal for Settlement Without Litigation." That statement made certain corrections in the examining agent's figures and expressly stated "For settlement purposes the net income shown in the Revenue Agent's Report is adjusted as follows: * * *." It is, therefore, evident that no real affirmation of the

Examiner's report was intended or required. Little of the complainant's evidence can be said to be inconsistent with this conclusion. Mr. Barton, one of Mr. duPont's attorneys, did say that the annuity question formed no part of the compromise, but it is difficult to reconcile that statement with Mr. duPont's letter and Mr. Cain's reply; nor was any explanation offered.

Mrs. duPont filed no formal protest against the Examiner's ruling on her reports for 1938 and 1939, but knew that a similar ruling was being protested by her husband. The Examiner's report to her of August 20th, 1941 stated that Mr. Ellis, her agent, did not agree with that ruling "since the issue in the related case of Mr. duPont will (would) be protested." Notwithstanding the Government notice in 1941 that a tax refund was due her for 1938 and 1939, Mrs. duPont did not apply for or accept it until after the controversy between Mr. duPont and the Government had been settled in April or May of 1942. The reasonable inference is, therefore, that in 1941 she did not regard the ruling by the tax examiner as finally determinative of her rights. Other pertinent facts will be commented on later.

Mrs. duPont's interest in the annuity contract of May 31st, 1924, was contingent upon her surviving her husband. By its provisions so long as Mr. duPont lived all annual payments were to be made to him; and in case of default the then scheduled value of the contract was likewise to be paid to him "if he be then living." It, therefore, follows that Mrs. duPont's rights in that contract were not of a possessory nature in November of 1938 and, independent of the contract of November 3rd, she then had no interest in the proceeds of its sale. Moreover, she paid no real part of the consideration for the annuity contract. Her inchoate right of dower in her husband's real estate was a substantial right (see *Dure v. Sharpe*, 12 *Del.Ch.* 1, 2, 114 *A.* 207) which could have been released to a purchaser of the property for a consideration, but there is nothing to indicate

that anything more than a gratuitous surrender of that right was intended when she joined with her husband in the deed to Delaware Realty and Investment Company.

On March 17, 1939, Mr. duPont wrote White & Case:

"Mrs. duPont and I have finally decided upon a division of the proceeds from the sale of annuity contracts * * * the basis of 75.84% to me and 24.16% to Mrs. duPont."

He then added:

"We propose that the notes shall be issued 75% to me and 25% to Mrs. duPont and the adjustment will be made in cash."

The percentages first referred to correspond with those inserted in Mr. and Mrs. duPont's tax reports for the years 1938 and 1939. Late in December of 1939, their books and the Empire State notes were adjusted on the same basis and the necessary checks to carry out this adjustment had been given the day before; but the reasonable inference is that these changes were not intended to be anything more than mere tentative acts awaiting a final authoritive determination of the rights of the parties. The calculations made and the figures inserted when the income tax reports for 1938 and 1939 were filed were not on any actuarial basis. It was thought that the tax officers would not accept round numbers, and the fair conclusion is that the subsequent book account and other adjustments were merely intended to correspond with the claims in the tax returns. All of these acts were in 1939 and must be considered with subsequent acts. In September of 1942 Mrs. duPont accepted tax refunds from the Government. This could only have been on the theory that Mr. duPont was entitled to all of the proceeds of the sale of the annuity contract and to the entire taxable gain thereon. The evidence also shows that Mrs. duPont had had considerable business experience and managed an annual income of about $200,000. The reasonable inference, therefore, is that the word "finally" in Mr. duPont's letter to White & Case was merely intended to be used in the sense of "at last."

Furthermore, for some reason not disclosed by the record, Mrs. duPont segregated all prior capital payments to her from the sale of the annuity contract in a special account opened in the Wilmington Trust Company as early as January 31st, 1940, or about three and one-half years before her death, and more than two years before Mr. duPont compromised the tax claims against him with the Commissioner's office. Mrs. duPont also regularly deposited all subsequent capital payments on notes to the same account. All interest payments on 25% of the notes were, however, deposited in her general account and were used for her own purposes; but after 1940 Mr. and Mrs. duPont filed joint income tax returns and the taxes on all of these receipts were paid by Mr. duPont.

In 1941, shortly after Mr. duPont's contention with respect to Mrs. duPont's rights in the proceeds of the sale of the annuity contract was first rejected by the tax office, he changed his will and bequeathed to her an annual income of $600,000 during her lifetime.

The defendant emphasizes the fact that on June 15th, 1943, the complainant borrowed $600,000 from Mrs. duPont on a note secured by ample collateral, and that a check therefor was drawn on the special account standing in her name in the Wilmington Trust Company. No other checks were ever drawn on that account.

Mrs. duPont's letter of December 19, 1939, to Mr. duPont seems unimportant. Mr. duPont explained his long delay in asserting his rights to the entire proceeds of the sale of the annuity and adjusting it with Mrs. duPont by the statement that he was advised that until the statute of limitations had run against the Government's claim the entire tax controversy, involving tremendous sums of money, could be reopened by it. The record also shows that the statutory period did not run until two or three months before Mrs. duPont's death. Any possible inferences that might be drawn from the acts of Mrs. duPont in opening

and maintaining the special account in the Wilmington Trust Company are at least not inconsistent with Mr. duPont's explanation. The acceptance of the tax refund is also a pertinent fact. Nor does the defendant claim that Mrs. duPont was in any way injured by the complainant's delay in asserting his rights.

The parties tentatively agreed in the November 3rd, 1938, contract that 25% of the proceeds of the sale of the annuity contract should be allocated to Mrs. duPont, but apparently with her consent 24.16% was paid to her. By a subsequent provision of the contract the parties agreed that "if it should be authoritatively decided" that the value of the interest of either party was "in excess of, or less than 75% and 25%, "the percentage as thus (authoritatively) calculated shall be substituted" therefor, and any "excess amount" received by either party shall be repaid to the other. The third recital in the contract and other pertinent facts indicate that no gift by either party was intended.

Naturally, a mathematical calculation was contemplated as the parties thought Mrs. duPont had some interest in the fund in controversy, but an authoritative determination of their rights was the real purpose of the contract, and as Mrs. duPont had no interest, any calculation could only result in zero. To hold that the figures tentatively agreed on could only be changed by a real calculation would seem to unduly emphasize contemplated procedural methods under facts which did not exist, at the expense of the real intent of the parties, and would amount to a gift to Mrs. duPont.

It is true that courts must ordinarily give to language that is clear and unambiguous the force and effect to which it is entitled, and cannot make a new contract for the parties; but contracts are always to be construed liberally so as to carry out their intention. *Hajoca Corp. v. Security Trust Co.*, 2 *Terry* (41 *Del.*) 514, 25 *A.* 2d 378.

The testimony of both Mr. Ammerman and Mr. Armentrout is predicated on an unwarranted premise, and is unimportant.

My conclusion is that a trust for the benefit of Pierre S. duPont must be impressed on: (1) The capital fund standing to the credit of Alice Belin duPont, in her special account, in the Wilmington Trust Company at the time of her death; (2) the $600,000 note securing money drawn from that account during Mrs. duPont's lifetime; (3) all unpaid Empire State notes tentatively allocated to Mrs. duPont; and (4) all interest maturing on such notes since Mrs. duPont's death, and received by the Wilmington Trust Company as her executor.

The evidence does not, however, justify a decree impressing a trust on any interest on said notes received by Mrs. duPont during her lifetime.

The defendant's cross bill will be dismissed.

A decree will be entered accordingly.