**The CLEVELAND TRUST COMPANY, an Ohio Corporation, Successor Trustee of and Under Certain Trusts Created by George Gund, Plaintiff Below, Appellant,**

v.

**WILMINGTON TRUST COMPANY, a Delaware Corporation, Defendant Below, Appellee.**

Supreme Court of Delaware.

Sept. 10, 1969.

H. Albert Young and Bruce M. Stargatt, of Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiff below, appellant.

Robert H. Richards, Jr., and E. Norman Veasey, of Richards, Layton & Finger, Wilmington, for defendant below, appellee.

CAREY and HERRMANN, JJ., and CHRISTIE, Judge, sitting.

HERRMANN, Justice.

This appeal requires us to decide whether, under the trust agreements here involved, the trustee is entitled to fees on principal upon transfer of the res to a successor trustee; and if so, the amount thereof.

## I.

The trust provision in controversy provides that the trustee is entitled to: "A fee upon principal of 1% of the fair market value at the time distributed or transferred."

The plaintiff The Cleveland Trust Company contends that the words "distributed or transferred" relate to distributions or transfers to trust beneficiaries only; that, therefore, the defendant Wilmington Trust Company is not entitled under this provision to a fee on principal upon the transfer of the res to The Cleveland Trust Company as successor trustee. Wilmington Trust, on the other hand, contends that the provision entitles the trustee to the specified fee on principal when the res is either "distributed" to beneficiaries or "transferred" to a successor trustee.

■ We agree with the Chancery Court that the provision is reasonably susceptible to either meaning; and because of the ambiguity, parol evidence as to "pertinent explanatory circumstances" may be considered to resolve the uncertainty and ascertain the intent of the parties. DuPont v. Wilmington Trust Co., 29 Del.Ch. 7, 45 A.2d 510 (1946).

Our scope of review in a case of this kind covers both facts and law. The determination of the Chancery Court as to the intent of the parties is reviewable to the extent of ascertaining whether that Court was clearly wrong in its finding, with due regard for its opportunity to adjudge the credibility of witnesses. Lank v. Steiner, Del., 224 A.2d 242 (1966). To this end, we are obliged to review certain of the facts at length.

## II.

The dispositive facts are undisputed:

*The Pre-Agreement Developments:*

In 1929, George Gund, being a resident of Ohio and an officer of The Cleveland Trust Company, established a revocable trust with Wilmington Trust, the sole purpose of which was to transfer legal title of certain stock out of Ohio and into Delaware in order to avoid possible Ohio taxes. The function of Wilmington Trust was to provide safekeeping for the stock, hold title, and collect and transmit dividends as Gund directed. For these services, a trustee's fee was established on the basis of $1,000 per year "for the period during which the trust has actually been in existence." In 1935, the trust was revoked by Gund. At his insistence, the fee was computed and paid on a per diem basis for the part of the year 1935 during which the trust existed.

In the interim, during 1931, there had been an exchange of correspondence between Gund and Wilmington Trust as to trustee's fees in the event Gund made the trust irrevocable. Wilmington Trust informed Gund on that occasion that its usual fee for handling irrevocable trusts of over $100,000 was an annual charge of 3% of income and "a distribution fee upon the final termination of the trust" of 1% of principal. In a later letter, responding to Gund's suggestion that the fee arrangement on an irrevocable trust be the same $1,000 per year arrangement as he had for the revocable trust, Wilmington Trust stated: "Our regular rate is three percent of income and one percent of principal upon final distribution at the end of the trust"; but that these rates were "subject to modification" and "could be substantially reduced." Nothing came of these negotiations and, as has been stated, Gund terminated the 1929 revocable trust in 1935.

In 1940, Gund again evidenced interest in creating irrevocable trusts with Wilmington Trust. These plans also had tax purposes: tax laws required that trust assets be removed completely from the ownership and control of the settlor in order to exclude the income from the settlor's income taxes and the principal from his gross estate upon death. Moreover, Gund was interested in Delaware trusts because he considered beneficial the apposite rule against per-

petuities and the Delaware rule pertaining to retention by the settlor of voting control of stock made part of the res.

A letter of June 20, 1940 from Gund to Wilmington Trust was the first of a series of important communications. It outlined the kind of irrevocable trust Gund was considering and concluded: "Please also state your basis of charges on irrevocable trusts." In its response dated June 22, 1940, Wilmington Trust stated:

"As to our basis of compensation, it is our practice these days to have written into our trusts a general fee clause, reading somewhat as follows:

"Trustee shall be entitled to receive, as compensation for its services hereunder, an annual commission upon the gross income of the trust fund and a fee upon distribution of a part or all of the trust fund at the usual rates charged for trusts of a similar character; and in case of any extraordinary services performed by it hereunder Trustee shall be entitled to receive a reasonable compensation therefor.

"The above clause, as you surmise, gives the Trustee the opportunity to keep fees in line with those being charged on new business, which is a reasonable protection to both Trustee and the beneficiaries. Particularly would such a clause be in order in a long-term trust such as you are contemplating. In this connection I am enclosing herewith a schedule now in force in this community covering fees for 'living trusts', which would be the basis for our compensation until such time as the local schedule might be changed."

The printed schedule of fees thus forwarded to Gund contained a preamble stating that the trust institutions of Wilmington had agreed upon that schedule of fees "as a guide in fixing their compensation as trustee under living trusts and life insurance trusts"; that the rates specified were intended "to be minimum rates contemplating normal services only, and intended to be applied impartially and uniformly to all customers alike." The schedule for "Living Trusts" first set forth the rates of "Annual Commission on Income Received", ranging on a graduated scale from 2% to 5%. It then set forth the graduated rates of "Commission on Principal", culminating in the rate pertinent here of "1% on all over $1,000,000." Immediately under that specification was the following statement:

"Commission on principal is to be taken on the fair value of all trust principal when withdrawn or distributed or transferred to a successor trustee * * *."

The following appeared immediately thereafter:[1]

"*Exception 1.* SHORT TERM TRUSTEESHIP. If withdrawal or distribution or transfer of trust principal to a successor trustee takes place within three years, the commission on the principal involved shall be three tenths of the commission at the scheduled rates, and there-

---

1. The language of the printed schedule on principal fees seems fashioned directly upon Rule 132 of the Chancery Court, Del.C.Ann. which provides for commissions to trustees as follows:
   "(e) Principal Commissions Upon Distribution or Transfer. Upon partial or complete distribution of any trust, or upon transfer to a successor trustee, the aggregate principal commissions allowable shall not be less than—[here follows a graduated schedule culminating in 1% of the principal on all over $1,000,000.]
   "Provided, however, that if at the time of distribution or transfer of the princi-

pal as aforesaid, the trust shall have been administered by the trustee for a period less than ten years, such principal commissions shall be reduced to the following percentages of the rates hereinabove specified: [here follows a graduated scale culminating in 100% if termination occurs after 9 years].
   *     *     *     *     *
   "Such minimum aggregate principal commission shall be computed on the basis of the fair value of the trust estate at the time of partial or complete distribution or of transfer to a successor trustee. * * *"

after one tenth additional for each year up to the tenth year, after which the scheduled rates shall be charged."

Apparently, there was no further communication after June 22 until Gund's letter of December 19, 1940 to Wilmington Trust stating that he was thinking of an irrevocable trust of certain stock for his four children. Gund stated that there would be only one income check of over $650,000. each year; and as to trustee's compensation he asked for "a favorable basis say 1½% and 1% for final distribution." This inquiry was answered in a telephone conversation on December 21, in which Gund was informed by Walter J. Laird, vice president and trust officer,[2] that as to the trustee's fee on income, Wilmington Trust would accept a minimum of 1½% for one trust or 1¾% for each of four trusts. There apparently was no reference in this reply to Gund's request for a fee arrangement of "1% for final distribution", and up to this stage of the discussions, there was no suggestion of any special provision for removal of the trustee and transfer of the trust property to a successor trustee.

On December 26, Wilmington Trust received Gund's letter of December 23, enclosing a draft of trust agreement prepared by his attorney and stating that he had just about decided on four separate trusts for each of his children. No copy of the draft was preserved; but it appears that this draft presented for the first time the idea of expressly providing for the possible removal of the trustee and transfer of the trust assets to The Cleveland Trust Company as successor trustee, at the option of the children and grandchildren of Gund.

By letter dated December 27, Wilmington Trust confirmed a telephone conversation between Laird and Gund of that date stating that, while it had a series of specified suggestions for improvement of the draft agreement, it was in general accord with the draft "except for the compensation clause"; that a tentative understanding had been reached in the telephone conversation regarding "a fee clause showing a top commission on income of 2½% and a minimum commission on income of 1¾%;" that a suggested compensation clause was enclosed with the letter. The first subsection of the clause thus transmitted provided a schedule of fees on gross income, ranging from 1¾% to 2½% based upon the fair market value of the principal of the fund on the anniversary date of the trust when the commission is charged; and in the second subsection of the proposed clause, the following appeared:

"(b) A fee upon principal of 1% of the fair market value at the time distributed or transferred."

On December 28, Gund wrote two letters to Wilmington Trust, both focusing on the principal fee clause forwarded with Wilmington Trust's letter of December 27. In the first letter, Gund discussed the proposed principal fee to be charged at the time of distribution to beneficiaries. He stated: "As the Trust is irrevocable, I cannot see how any distribution can occur before approximately twenty-one years in any event." After bargaining for a schedule of distribution charges of 1% if distribution be made within 5 years, ¾% between the 5th and 10th years, and ½% thereafter, Gund stated in this letter:

"Please do not telephone me Monday. Simply send me a wire via Western Union stating that you are agreeable to ½ of 1% distribution fee as outlined herein.

"As I understand it, this ½ of 1% fee at the time of distribution applies only to the actual final distribution of the Principal or Corpus of the trust; in other words, there will be only one charge ever made as a Distribution Charge. Answer this in your telegram, also, please."

---

2. Laird was deceased when this action was commenced. Gund's testimony was presented by deposition.

Evidently, after the first letter of December 28 was mailed, Gund spoke with Laird by telephone on that day. The result was a second letter to Wilmington Trust of December 28 in which Gund stated:

"* * * I had not thought seriously of the possibility of ever seeing the trust withdrawn from the Wilmington Trust Co. Consequently that idea never seemed to be in my calculations of the distribution fee; and my letter of today did not contemplate such likely action. However, I do feel that my setting up a scale reduction, after a period of years is exactly what has recently been offered me elsewhere. It is eminently fair. I can only say that I cannot finally approve any other basis.

"I want to put through the trust if it can be done in time and on a basis reasonable for the size of the trust."

Wilmington Trust replied to Gund's two letters of December 28 by its telegram of December 30 stating:

"* * * Accept your ideas on revision of distribution fee but while have no complaint on annual fee under present circumstances feel that since trust may last for seventy or eighty years we either ought to have an opportunity for reconsideration of annual fee after five or ten years experience or a one-half of one percent higher annual fee from the beginning. Stop. Fee on principal only charged once by us. Stop. If trust transferred to another trustee fee would be prorated. * * *."

On December 30, Gund sent to Wilmington Trust an executed trust agreement for his son George Gund, III. He stated in a covering letter that the agreements for his three other children would follow on the same or the following day; that an immediate proof-reading of the agreement by Laird was requested, to be followed by a telegram of approval; that he had signed the agreement as of December 31, and that he wished the transaction to be completed "without fail" as of that date. On December 31, Wilmington Trust sent Gund the following telegram:

"Your letter and trust just received. Stop. Will proof-read promptly as possible but have to advice we will not accept trust except on compensation basis given in our letter twenty-seventh or our wire thirtieth. Stop. Please advice acceptance or rejection."

By handwritten note dated December 30, Gund informed Wilmington Trust: "We are accepting your basis." Gund requested therein confirmation by telegram that "Everything was closed December thirty-first." By letter of January 2, 1941, Wilmington Trust advised Gund that all four trust agreements had been received, approved, and executed as of December 31.

*The Terms of the Trust Agreements:*

Each of the trust agreements is identical in the following respects regarding removal of the original trustee, appointment of a successor trustee, and compensation to the original trustee on principal:

The trustee may be removed at any time, and The Cleveland Trust Company (or one of two other specified trust companies) may be appointed successor trustee, by the beneficiary of the trust (acting through his guardian if under 21 years of age); or, after the death of the beneficiary, by his eldest surviving lawful issue who has attained majority; or in default of such issue so qualified, by the guardian of the estate of such issue; or in default of such issue, by Gund's eldest then surviving lawful issue who has attained majority; or in default of such issue of Gund so qualified, by the guardian of the estate of Gund's eldest then surviving lawful issue.

Each trust agreement contains the provisions for trustee's compensation which were set forth in the suggested compensation clause sent by Wilmington Trust to Gund with its letter of December 27: First, there is the provision for commission on

gross income, ranging from 1¾% to 2½% based upon the fair market value of the principal of the fund on the anniversary date of the trust when the commission is charged. Immediately thereafter in each trust agreement, the following provision appears:

"(b) A fee upon principal of 1% of the fair market value at the time distributed or transferred."

### The Post-Agreement Developments:

In May 1961, Gund initiated action to remove Wilmington Trust as trustee and to appoint The Cleveland Trust Company as successor trustee. Gund was then president and principal owner of The Cleveland Trust Company. He gave as his reason the fact that his eldest son was about to become 25 years of age and would then receive the income from the trust established for his benefit; that he was concerned about his son's ability to handle money; that, therefore, he wished to have the trust in the hands of his own bank. Wilmington Trust replied by pointing out the lack of necessity for such action, the facilities and services offered by its organization to beneficiaries, and the provision of the trust agreements for fees upon principal of 1% at the time of any such transfer. There followed a series of communications regarding Wilmington Trust's entitlement to the 1% fee on principal upon transfer to a successor trustee. During this discussion, Wilmington Trust offered to submit the question to the Delaware Court of Chancery for instructions or a declaratory judgment. The offer was not accepted. On November 30, 1961, Wilmington Trust was removed as trustee of all trusts and The Cleveland Trust Company was made successor trustee.

Based upon 1% of the combined total principal value of all trusts in the amount of $78,202.183., the combined total principal fee charged by Wilmington Trust was the sum of $782,021.83. That amount was retained by Wilmington Trust and the balance of the corpus of each estate was transferred to The Cleveland Trust Company as successor trustee.

The Cleveland Trust Company brought this action for the amount thus retained. The Chancery Court held that Wilmington Trust was entitled under the trust agreements to the commissions thus retained. The Cleveland Trust Company appeals.

### III.

■ The initial question to be decided is whether, in agreeing in the trust instruments to a fee upon principal of 1% of fair market value at the time "distributed or transferred", the parties intended the word "transferred" to apply to a transfer to a successor trustee. The Chancery Court found that it did. In the light of the facts set forth above and emphasized below, we are of the opinion that this decision of the Chancery Court is correct:

First, as early as the communication of June 22, 1940, Wilmington Trust's printed schedule of fees on principal clearly distinguished a distribution to beneficiaries from a transfer to a successor trustee: "Commission on principal is to be taken * * * when withdrawn or distributed or transferred to a successor trustee * * *." Moreover, the exception dealing with short term trusteeships, spelled out in the printed schedule, referred to "withdrawal or distribution or transfer of trust principal to a successor trustee."

Secondly, it is manifest that the draft of trust agreement prepared by Gund's attorney, and transmitted by Gund under date of December 23, contained the present elaborate reservation of power in Gund's children and grandchildren to remove Wilmington Trust at will and appoint a successor trustee. These extraordinary provisions of the draft made more significant, than would have otherwise been the case, the distinction between distribution to beneficiaries and transfer to successor trustee spelled out in the communication of June 22. Until the draft was presented, it ap-

pears that the parties had been discussing fees on termination or final distribution only. Because of the special provisions in the draft for removal and transfer, however, it became appropriate for the first time to provide expressly in the agreement for commissions to be paid at the time of such removal and transfer. The suggested compensation clause of December 27, expressly providing for a fee upon "transfer", obviously was the result.

Next, Gund stated at a late stage of the negotiations that his earlier references to termination of the trusts and principal fee on distribution were unrelated to the idea of transfer to a successor trustee. That Gund as well as Wilmington Trust ultimately distinguished between distribution to beneficiaries and transfer to successor trustee is clear from Gund's second letter of December 28 wherein he stated: "I had not thought seriously of the possibility of ever seeing the trust withdrawn from Wilmington Trust Co. Consequently, that idea never seemed to be in my calculation of the distribution fee."

Finally, it is clear from Chancery Court Rule 132 that it was customary in banking circles to distinguish between "distribution" to beneficiaries and "transfer" to a successor trustee as words of art. It must be assumed that Gund, by reason of his background and experience, was aware of that distinction.

Therefore, in the light of the record before us and with due consideration for the acumen of Gund as banker and businessman, we agree with the Chancery Court's conclusion that the parties intended the words "distributed or transferred", as used in the principal fee clause of the trust agreements, to mean "distributed to beneficiaries" or "transferred to successor trustee."

The Cleveland Trust argues that Wilmington Trust is entitled to no fee on principal under the trust agreements because the ambiguity in the fee clauses must be resolved against it as the drafter thereof,

citing Philadelphia Storage Battery Co. v. R.C.A., 22 Del.Ch. 321, 2 A.2d 80 (1938); B.S.F. Company v. Philadelphia National Bank, 42 Del.Ch. 106, 204 A.2d 746 (1964). The Chancery Court stated that this construction-against-the-drafter rule may be invoked only as a rule of last resort when all other means of ascertaining the intent of the parties fail; and The Cleveland Trust Company agrees. See Aldrich v. Charles Beauregard and Sons, Inc., 105 N.H. 330, 200 A.2d 14 (1964); Empire Rubber Mfg. Co. v. Morris, 73 N.J.Law 602, 65 A. 450 (1906). As appears above, we think that the intent of the parties as to the meaning of the word "transfer" is ascertainable from other aspects of the case. We agree with the Chancery Court, therefore, that the "drafter rule" of construction is not applicable in this situation.

Accordingly, we hold that the Chancery Court was correct in concluding that Wilmington Trust is entitled under the trust agreements to fees on principal upon transfer of the trust res to a successor trustee.

### IV.

The next question is the amount of the fees on principal to which Wilmington Trust is thus entitled.

The Chancery Court concluded that Wilmington Trust is entitled to the full amount it retained, on the contract basis of 1% of fair market value of the trust principal at the time of the transfer to The Cleveland Trust Company. In reaching this conclusion, the Chancery Court held that The Cleveland Trust Company cannot prevail in its contention that Wilmington Trust had agreed to prorate the principal fee in the event of transfer to a successor trustee. This contention was based upon the course of prior dealings between the parties and upon the statement in Wilmington Trust's telegram of December 30: "Fee on principal only charged once by us. Stop. If trust transferred to another trustee fee would be prorated." The Chancery Court held that the word "prorated" there ap-

pearing, because unrelated to any other discussions between the parties and unimplemented by any standard or formula of application, is meaningless; that, therefore, there is no enforceable agreement between Gund and Wilmington Trust as to proration.

We are of the opinion that the Chancery Court reached the correct result in holding that Wilmington Trust is entitled to the full amount it retained for fees and commissions. However, we think the following basis for that result is the proper one:

▉ Each of the trust agreements contains the following clear and unambiguous provision as to the amount of the fee on principal which we have found to be owing upon transfer of the res to a successor trustee:

"A fee upon principal of 1% of the fair market value at the time distributed or transferred."

This "1% of the fair market value" language establishes the amount of the fee plainly and clearly; there is no ambiguity as to that facet of the trust agreements; and in the absence of ambiguity there is no room for parol evidence as to that issue. Parol evidence may not be admitted to vary or contradict a plain and unambiguous provision of a trust agreement. Lewis v. Hanson, 36 Del.Ch. 235, 128 A.2d 819 (1957); Carey v. Shellburne, Inc., Del., 224 A.2d 400 (1966).

▉ Accordingly, we hold that evidence of the course of prior dealings between the parties and of the telegram of December 30 was inadmissible as to the issue of the amount of the fee. As to that issue, the prior dealings and the telegram constituted extrinsic evidence adduced to contradict and vary the clear and unambiguous language of the trust agreements. Similarly, the deposition of Gund was not admissible on the issue of proration and the amount

of the fees on principal to be received by Wilmington Trust. Statements by the settlor as to his intentions are not admissible where they contradict express provisions of the trust instrument which are plain and clear. 2 Scott, Trusts § 164.1.

Under this view of the evidence, the Chancery Court had nothing before it upon which the issue of proration could properly be considered. The case of DuPont v. Wilmington Trust Co., 29 Del.Ch. 7, 45 A.2d 510 (1946), relied upon below as the basis for the admissibility of the parol evidence here under review, is not inconsistent with our conclusions here.

We uphold, therefore, the Chancery Court's decision that Wilmington Trust is entitled to 1% of the fair market value of the trust principal transferred to The Cleveland Trust Company, being the amount retained by Wilmington Trust as fees on principal.

### V.

The Cleveland Trust Company contends that the Chancery Court erred in failing to find excessive the fees on principal charged by Wilmington Trust and in refusing to decrease it under Chancery Rule 132.[3]

The Chancery Court reviewed at length the reasonableness of the 1% principal fee charged by Wilmington Trust under the facts and circumstances of this case. It pointed out that under the minimum schedules contained in Rule 132, Wilmington Trust would have been entitled to a larger principal fee upon the transfer than was charged under the trust agreements. It found that Wilmington Trust "performed in all respects the ordinary duties of a trustee in similar circumstances." There is no assertion anywhere in this case that Wilmington Trust did not perform its duties faithfully and well.

3. Chancery Rule 132 provides that trustees' commissions are "subject in any case to increase or decrease by the court for cause appearing sufficient to the court."

■ The declination of the Chancery Court to decrease the fee under Rule 132 was an exercise of judicial discretion. Bogert, Trusts and Trustees § 977. We find no basis upon which it can be said that there was an abuse of such discretion. Accordingly, we uphold the decision below on this point.

## VI.

Finally, it is contended by The Cleveland Trust Company that the Chancery Court erred in holding that Wilmington Trust's reasonable counsel fees in this case should be taxed as costs. The Cleveland Trust Company relies upon the general rule that each litigant is required to bear his own suit costs regardless of the outcome of the litigation. But this is not the ordinary situation to which the general rule applies. The Chancery Court pointed out that the right of a trustee to an award of counsel fees, incurred in the defense of its right to compensation as trustee, is generally recognized. E. g., West Coast Hospital Association v. Florida National Bank of Jacksonville, Fla., 100 So.2d 807 (1958); In re Messer's Guardianship, 246 Wis. 426, 17 N.W.2d 559 (1945). Compare Weidlich v. Comley (2 Cir.) 267 F.2d 133 (1959). The Cleveland Trust Company was unable to cite any authority to the contrary. Also, as the Chancery Court noted, the issues raised here might well have been brought on for decision in a suit for instructions initiated by Wilmington Trust; in which case, Wilmington Trust's entitlement to counsel fees would have been unquestionable. Maurer v. International Re-Insurance Corp., 33 Del.Ch. 456, 95 A.2d 827 (1953).

■ We agree with the Chancery Court's analysis of, and holding upon, this question. Compare Aaron v. Parsons, 37 Del.Ch. 407, 144 A.2d 155 (1958).

We find no reversible error. The judgment below is affirmed.