# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| B&C HOLDINGS, INC., a Colorado corporation, | ) ) | |
| Plaintiff/ Counterclaim Defendant, | ) ) ) | C.A. No. N19C-02-105 AML CCLD |
| v. | ) ) ) | |
| TEMPERATSURE HOLDINGS, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Defendant/Counterclaim Plaintiff/ Third Party Plaintiff, | ) ) ) | |
| v. | ) ) | |
| CHRISTOPHER SMITH, | ) ) | |
| Third Party Defendant. | ) | |

Submitted: January 28, 2020
Decided: April 22, 2020

## MEMORANDUM OPINION

**Upon Plaintiff's and Third Party Defendant's Motions for Summary Judgment: GRANTED**

**Upon Defendant's Motion for Summary Judgment: DENIED**

### Attorneys and Law Firms

Philip Trainer, Jr., Esquire, and Randall J. Teti, Esquire, of ASHBY & GEDDES, Wilmington, Delaware, and Paul H. Schwartz, Esquire, of SHOEMAKER GHISELLI + SCHWARTZ LLC, Boulder, Colorado, Attorneys for Plaintiff/Counterclaim Defendant B&C Holdings, Inc. and Third-Party Defendant Christopher Smith.

Elizabeth M. McGeever, Esquire, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware, and S. Kirk Ingebretsen, Esquire, of SHOOK HARDY & BACON L.L.P., Denver, Colorado, Attorneys for Defendant/Counterclaim Plaintiff/Third Party Plaintiff Temperatsure Holdings, LLC.

LEGROW, J.

This dispute concerns the meaning of language in a promissory note, specifically what constitutes a "Principal Statement" within the note's terms. The promissory note defined and secured an earn-out payment that formed part of the consideration that buyer, the defendant in this action, agreed to pay seller, the plaintiff, when it purchased seller's temperature controlled packaging systems business.[1] The note specified how the earn-out – the note's principal – was to be determined and paid to seller. The amount of the earn-out depended on the buyer's calculation of the purchased business's consolidated profits over a specified period after the sale.[2]

Although it is clear from the note that buyer's delivery of a Principal Statement to seller was a preliminary step in the process for finalizing the note's principal, the parties disagree over which of two documents constitute the operative "Principal Statement." On July 7, 2017, buyer's CFO sent an email to seller's co-owner and former CEO stating that "[y]ou should receive $125,000 which is 5 months interest on the note."[3] It is undisputed that five months of interest in the amount of $125,000 equates to a $6,000,000 principal amount, which was the maximum earn-out that could be achieved under the parties' agreement. Over a year later, however, on August 6, 2018, buyer's president sent seller an email stating that

---

[1] B&C's Opening Br. in Supp. of Mot. for Summ. J. (hereinafter "B&C Mot.") 1.
[2] *Id.*, Ex. 1 Temperature Holdings, LLC Subordinated Promissory Note (hereinafter "Note") § 2(a).
[3] *Id.*, Ex. 28.

1

it was providing long overdue gross profit statements along with a spreadsheet purporting to be a Principal Statement. [4] That spreadsheet stated the note's Principal was $946,671.[5] Seller took the position that the August 2018 communication was late and, in any event, barred by the note's terms because the July 2017 email was a Principal Statement and its calculations became final and binding after seller did not dispute the calculation within the contractually-specified period.

When buyer rejected seller's demand for $6,000,000 under the terms of the note, seller initiated this breach of contract and declaratory judgment action against buyer. In response, buyer filed counterclaims, affirmative defenses, and a third-party complaint for breach of fiduciary duty. All parties have filed motions for summary judgment. The dispositive issue presented by the cross-motions is which document constitutes buyer's "Principal Statement" under the note. Because I find that the 2017 email constitutes a Principal Statement according to the note's plain meaning, I conclude the principal is $6,000,000. I further find there are no disputed facts upon which a fact finder could conclude the seller's former CEO, who also became a member of buyer's board, breached his fiduciary duties. My reasoning follows.

---

[4] *Id.*, Ex. 72; Compl. ¶¶ 73-74.
[5] *Id.*

2

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the facts are drawn from the complaint and the record the parties provided with their briefs. On April 7, 2016, Temperatsure Holdings, LLC ("Temperatsure" or the "Company") purchased Temperatsure, LLC ("Opco") from B&C Holdings, Inc. ("B&C").[6] The parties agreed that a contingent "earn-out" payment would form part of the sale's consideration.[7] The earn-out was secured by a promissory note (the "Note"), which defined how the parties would (i) calculate the earn-out, (ii) communicate regarding the amount of the earn-out, and (iii) resolve any disputes arising from that process.[8]

**The Note**

The Note specifies the Principal will be based on Opco's Last Twelve Months' Gross Profit ("LTM Gross Profit").[9] The Note defines "LTM Gross Profit" as the following:

> the gross profit performance of [Temperatsure] and Opco, measured by the last twelve months' ("LTM") consolidated gross profit of [Temperatsure] and Opco determined in accordance with United States generally accepted accounting principles ("GAAP") as of the last day of each month between (and including) January 31, 2017 and July 31, 2017[.][10]

---

[6] Compl. ¶ 1.
[7] Temperatsure's Combined Answering Br. in Opp'n to B&C Mot. and Opening Br. in Supp. of Cross-Mot. for Summ. J. (hereinafter "Temperatsure Mot.") 1.
[8] *Id.*
[9] Note § 1(ii)-(iii).
[10] *See id.* § 1(ii).

3

The months of January 2017 through July 2017 were defined as the "Evaluation Period."[11] If the LTM Gross Profit reached $19,000,000 in any month of the Evaluation Period, the Principal would be $6,000,000.[12] If LTM Gross Profit never exceeded $18,000,000, the Principal would be $0.[13] If the highest LTM Gross Profit for any month in the Evaluation Period was between $18,000,000 and $19,000,000, the Principal would be between $0 and $6,000,000, determined on a straight-line basis using that highest LTM Gross Profit.[14]

"[F]ollowing the end of each month during the Evaluation Period," the Note required Temperatsure to "prepare, or cause to be prepared, a statement (each, a 'LTM Gross Profit Statement') setting forth the determination of the amount of the LTM Gross Profit for the applicable month."[15] Each "LTM Gross Profit Statement" was to include "reasonable supporting documentation for the estimates and calculations contained therein (together with any information reasonably requested by [B&C])."[16]

According to Section 2(b) of the Note, Temperatsure would determine the Principal "based on the greatest LTM Gross Profit set forth on any LTM Gross Profit Statement delivered with respect to the Evaluation Period" and provide a Principal

---

[11] *Id.* § 1(ii).
[12] *Id.* § 1(iii).
[13] *Id.*
[14] *Id.*
[15] *Id.* § 2(a).
[16] *Id.*

4

Statement "as soon as practicable after the LTM Gross Profit Statement for the month ended July 31, 2017 is prepared, but in no event later than fifteen (15) days following the last day of the Evaluation Period."[17] Section 2(c) of the Note provides:

> Within fifteen (15) days after the Evaluation Period, [Temperatsure] will deliver to [B&C] a statement setting forth its calculation of the Principal to [B&C] (the "Principal Statement").[18]

Section 2(c) of the Note also includes a detailed dispute resolution process setting forth exactly when the Principal is considered "finally determined." Section 2(c) of the Note provides:

> [B&C] will have from the time the Principal Statement is delivered to [B&C] until 5:00pm Pacific Time, on the fifteenth day after the date of such delivery (the "Dispute Period") to dispute any elements of or amounts reflected on the Principal Statement that affect the calculation of the Principal (the "Dispute").[19]

If a dispute notice is delivered, Temperatsure has 15 days to notify B&C that it disagrees (the "Dispute Response"). If Temperatsure does not deliver a Dispute Response, B&C's calculation of Principal is deemed "final and binding" and "effective as of the first day following the end of the Evaluation Period."[20]

Finally, if Temperatsure delivers a Dispute Response and the parties are unable to reach agreement, an accountant shall arbitrate "each element of the

---

[17] *Id.* § 2(b)-(c).
[18] *Id.* § 2(c).
[19] *Id.*
[20] *Id.*

5

Dispute."[21]  As above, once the Dispute is resolved, the final determined Principal amount is "effective as of the first day following the end of the Evaluation Period."[22]

The Note requires Temperatsure to "pay simple interest (computed on the basis of a three hundred sixty-five (365)-day year) on unpaid Principal, accruing from the date on which the Principal is finally determined to be any amount greater than $0 pursuant to Section 2, at the rate of 5.00% per annum."[23]  The initial annual interest rate of 5% increases to 10% if Temperatsure defaults.[24]  Interest under the Note is due quarterly.[25]

**Smith and Kahle Correspond**

Temperatsure's CFO, Robert Kahle, performed the LTM Gross Profit calculations.[26]  Sometime in February 2017, Kahle verbally informed B&C's co-owner and Temperatsure's former CEO, Christopher Smith, that the LTM Gross Profit as of January 31, 2017 had exceeded the $19 million threshold set forth in Section 1(iii) of the Promissory Note, and the Principal therefore would be $6,000,000.[27]  According to Temperatsure, Kahle's assessment of the LTM Gross

---

[21] *Id.*

[22] *Id.*

[23] *Id.* § 3.

[24] *Id.*

[25] *Id.*

[26] Compendium of Transcripts cited in B&C's Mot., Tab 4, Dep. of Robert Kahle (hereinafter "Kahle Dep.") 52:17-21.

[27] *See id.*, Tab 2, Dep. of Christopher P. Smith (hereinafter "Smith Dep.") 109:6-14.

Profit as of January 31, 2017 was inconsistent with GAAP.[28] Specifically, Temperatsure alleges Kahle's computation relied on internal financial statements that were not GAAP-compliant and did not account for depreciation on costs of goods sold.[29] Although he made this communication, Kahle never sent B&C any monthly LTM Gross Profit Statements during the Evaluation Period.[30]

Nonetheless, Kahle later confirmed that Principal calculation in writing. Smith sent Kahle the following email on June 28, 2017:

> Rob
>
> Obviously I am not too worried about it but you should plan on paying my Qtrly Note Payment in July sometime unless you want to do it in June.[31]

Kahle then responded:

> CP
>
> Thanks for the reminder. We've got it accrued. I just need to check the cash balance after the shareholder distribution. It won't be a problem.[32]

One week later, on July 7, 2017, Kahle sent Smith the following email (the "July 2017 Email") in response to Smith's request for payment, stating:

> The interest payment is being wired today. You should receive $125,000 which is 5 months interest on the note.[33]

---

[28] *See* Kahle Dep. 58:20-22.
[29] *See id.* 62:10-17.
[30] *See id.* 60:12-15; Smith Dep. 65:9-17.
[31] *See* Aff. of Elizabeth M. McGeever (hereinafter "McGeever Aff."), Ex. B.
[32] *Id.*
[33] *See id.*, Ex. D.

At the Note's 5% rate, annual interest on $6,000,000 is $300,000, or $25,000 per month.[34] By stating that the interest was $25,000 per month, it is beyond dispute that Temperatsure had calculated the Principal as $6,000,000.[35]

Consistent with Kahle's representations, Temperatsure wired $125,000 to B&C the same day.[36] On July 22, 2017, Kahle reported to Temperatsure's Board that the interest payment had been made.[37] Because B&C stood to receive the maximum earn-out, Smith considered "the matter settled" and decided "not to call out [Temperatsure's] failure to provide B&C Holdings with LTM Gross Profit Statements and supporting documentation as required."[38]

**Temperatsure Repeatedly Affirms the $6,000,000 Principal**

On November 3, 2017, Temperatsure paid B&C $75,000 for another quarter's interest, again reflecting a $6,000,000 Principal.[39] Over the next eight months, each monthly Temperatsure board packet expressly reported the $6,000,000 Principal, multiple members of Temperatsure's Special Litigation Committee ("SLC")

---

[34] B&C Mot. 7.

[35] *See id.*

[36] Case information Statement, Exs. 5-6, Decl. of Christopher P. Smith in Supp. of Pl.'s Answering Br. in Opp'n to Def.'s Mot. to Dismiss or Stay ("Smith Decl.") ¶ 8.

[37] B&C Mot., Ex. 23 at 23813.

[38] *See* Compl. ¶ 43.

[39] Def.'s Answer to Pl.'s Compl. and Third Party Compl. (hereinafter "Answer") 17; *see* B&C Mot., Ex. 11 (SLC member Fry acknowledging that Temperatsure paid B&C $200,000 in total).

reviewed LTM Gross Profit figures, and no member ever articulated to Smith a concern that the $6,000,000 Principal wrongly was calculated.[40]

On April 9, 2018, the Company's auditors asked SLC member Dietz Fry directly whether the $6,000,000 earn-out had been achieved.[41] After acknowledging to the auditors that "[w]e initially thought that the earn-out was achieved," Fry and Silva Behrens re-examined the matter "with an understanding of the accounting errors made throughout the period."[42] At the end of the day on April 9, 2018, Behrens, copying Fry, confirmed to the auditors that "Yes," the "LTM figure during some months throughout the measurement period were above" the $19,000,000 threshold.[43] Fry did not correct his associate's answer.[44] Instead, over the next two-and-a-half months he treated the Principal as $6,000,000, even serving as the Board's point person in communications with Smith about a possible B&C conversion of the $6,000,000 Note into equity.[45] As late as June 27, 2018, the same day the Company formally proposed to B&C that it convert its $6,000,000 Note, new CFO Thomas Bell informed the auditors: "[B]ased on our best available current information, we believe the earn-out threshold was achieved."[46] When

---

[40] *See* Smith Decl. ¶ 19 & Ex. 13.
[41] *See* B&C Mot., Ex. 2-H.
[42] *See id.*, Ex. 2.
[43] *See id.*
[44] *See id.*, Ex. 2-H.
[45] *See id.*, Ex. 51.
[46] *Id.*

9

Temperatsure did change its position in July 2018, Bell still reported to Fry: "As part of the audit process I advised [the auditors] that we believed the earn-out was earned and that we had no reason to believe it was not earned (which was an accurate statement at the time)."[47]

By June 2018, Temperatsure was approaching the limit on debt-to-EBITDA ratio in its bank covenants.[48] On June 27, 2018, Temperatsure sent B&C a proposed conversion agreement that said: "The original principal amount and total accrued interest owed to [B&C] pursuant to the Note is $6,075,000."[49] The agreement proposed that B&C exchange the Note for 6,075,000 super-preferred LLC units in Temperatsure.[50] As Fry has admitted, this document was Temperatsure's proposal to B&C "that B&C convert what Temperatsure was at that time stating to be a 6-million-dollar debt plus some accrued interest into super-preferred equity."[51] B&C declined the proposal when it learned that the conversion might trigger a large tax liability.[52]

---

[47] *Id.*, Ex. 57.
[48] Compendium of Transcripts cited in B&C Mot., Tab 6, Dep. of Mark Dorman (hereinafter "Dorman Dep.") R119:6-9.
[49] B&C Mot., Ex. 14 at 14022.
[50] *Id.*
[51] Compendium of Transcripts cited in B&C Mot., Tab 1, Dep. of J. Dietz Fry (hereinafter "Fry Dep.") 136:6-13.
[52] *Id.* at 190:17-191:12.

## The August 2018 Spreadsheet

About two weeks after B&C refused to convert the debt, SLC member Derek Johnson emailed the Board that "while previously we as a board were under the opinion that the earn-out was fully achieved we now have a spreadsheet from the company that appears to show the earn-out was not fully achieved[.]"[53] Smith responded to Johnson's email by reminding the SLC members that the Note does not allow recalculations.[54] Outside Smith's presence, Fry and new CFO Thomas Bell described Temperatsure's new calculation as a revision to Temperatsure's first Principal calculation.[55]

On August 6, 2018, Temperatsure's president, Tony Aleide sent Smith an email stating that it was providing "copies of the LTM gross profit statements for the Months of January 2017 to July 2017, along with supporting documentation."[56] The email also stated it was providing the Principal Statement pursuant to Section 2(c) the Note, referring to an attached single-page spreadsheet (the "August 2018

---

[53] Smith Decl., Ex. 11.
[54] Compl. ¶ 72.
[55] *See, e.g.,* B&C Mot., Ex. 27 at 004 (referring to "yesterday's earn-out *recalculation*") (emphasis added); Ex. 56 (attaching "the first pass at the *revised* calculation for CP's earn-out") (emphasis added); Ex. 58 (discussing how to communicate to the bank that the earn-out was "being *reassessed*") (emphasis added); Ex. 59 at 54 (referring to the "*restated* seller note") (emphasis added).
[56] Compl. ¶¶ 73-74; B&C Mot., Ex. 72.

Spreadsheet").[57]   The August 2018 Spreadsheet claims that the Principal is $946,671.[58]

**The Principal Dispute**

On August 21, 2018, B&C's counsel wrote to Temperatsure to remind it of its July 2017 Email, its repeated affirmations of its $6,000,000 Principal calculation, and the Note's provisions that a Principal Statement becomes "final and binding upon the parties" if B&C does not dispute it.[59]   B&C explained that "[t]he Company's attempt to change the Principal long after it was established is of no effect," hence "no 'Dispute' exists under the Note that requires a B&C response."[60] B&C added that it also disagreed with the August 2018 Spreadsheet's accounting revisions.[61] It concluded by demanding that Temperatsure pay all past due interest.[62]

Temperatsure rejected B&C's demand.[63]   Although Temperatsure conceded that B&C had said it did not intend its August 21 letter to be a Dispute Notice, Temperatsure said it would construe the letter that way anyway.[64]   On August 27,

---

[57] *Id.*
[58] *Id.*
[59] Case Information Statement, Exs. 5-6, Decl. of Paul H. Schwartz in Supp. of Pl.'s Answering Br. in Opp'n to Def.'s Mot. to Dismiss or Stay ("Schwartz Decl."), Ex. 1.
[60] *Id.* at 1.
[61] *Id.* at 4-7.
[62] *Id.* at 7.
[63] Schwartz Decl., Ex. 2.
[64] *Id.* at 1-2.

12

2018, B&C sent Temperatsure a Notice of Event of Default.[65] Three days later, B&C filed this action, seeking (1) a declaration that the Note's Principal is $6,000,000 and Temperatsure owes past-due interest based on that amount, and (2) damages for breach of contract.[66] On September 5, 2018, Temperatsure sent B&C what it termed a "Dispute Response" declaring its intent to appoint an Arbitrating Accountant.[67] Temperatsure then commenced an arbitration, but told B&C it would hold the arbitration in abeyance until there was a judicial determination that a "Dispute" existed or that such question should be resolved by the Arbitrating Accountant. On April 18, 2019, the Court issued a bench ruling denying Temperatsure's motion to dismiss for lack of jurisdiction, holding that whether a Dispute exists under the Note is a question of substantive arbitrability reserved for the Court. The question of substantive arbitrability, as well as the merits of the parties' dispute, now are ripe for resolution through the pending cross-motions for summary judgment.

B&C originally filed its Complaint in the Court of Chancery.[68] On February 12, 2019, the Court of Chancery transferred the action to this Court's Complex Commercial Litigation Division under 10 *Del. C.* 1902. After this Court denied

---

[65] Schwartz Decl., Ex. 3; *see also* Note § 9(a)(ii) (failure to pay accrued interest within five business days of being due is event of default).
[66] Compl. ¶¶ 88-99.
[67] Schwartz Decl., Ex. 4.
[68] C.A. No. 2018-0645-JTL.

Temperatsure's motion to dismiss for lack of jurisdiction, Temperatsure answered the complaint, asserted affirmative defenses, and filed counterclaims against B&C and a third-party complaint against Smith. On December 10, 2019, B&C, Smith, and Temperatsure filed motions for summary judgment. The parties briefed those motions, and the Court heard argument on January 28, 2020.

**The Parties' Contentions**

B&C argues its claims in this action are not subject to arbitration and it is entitled to summary judgment on the merits of its declaratory judgment claim. With respect to jurisdiction, B&C argues there is no "Dispute" requiring arbitration because the principal amount is determined by the July 2017 Email. As to the merits, B&C contends the July 2017 Email is the Principal Statement because (1) Temperatsure sent the email to B&C; (2) whether Kahle intended the email to be a Principal Statement is irrelevant; (3) the requirements placed on Temperatsure in Section 2(b) do not modify the definition of Principal Statement; (4) a statement setting forth the Principal is sufficient to constitute a Principal Statement; (5) paying interest early does not prevent a Company statement from being a Principal Statement; and (6) Temperatsure delivered other statements to B&C setting forth its $6,000,000 Principal calculation.

In its cross-motion, Temperatsure argues it is entitled to summary judgment on the pending claims. In its counterclaims, Temperatsure seeks a declaration that

14

(1) according to Section 2(b), "preparation and delivery of GAAP-compliant LTM Gross Profit Statements is a condition precedent to determining the Principal amount of the Note;" (2) the July 2017 Email "is not a Principal Statement as contemplated by the Note;" and (3) the August 2018 Spreadsheet is "the only Principal Statement sent pursuant to Section 2(c) of the Note." Temperatsure also claims B&C unjustly was enriched "in the form of its receipt of purported interest payments in the total amount of $200,000."

Temperatsure contends the July 2017 Email cannot be the Principal Statement because (1) based on the Note's express provisions, an email that does nothing more than reference the anticipated payment of already accrued interest cannot, as a matter of law, be the Principal Statement; (2) interest cannot accrue until after the Principal Statement is delivered; (3) B&C's reliance on purported "extrinsic evidence" as proof that a Principal Statement must have been delivered misstates the law and disregards the undisputed facts; (4) the Note's terms do not support increasing the Principal Amount from the $946,671 amount calculated in August 2018 to $6,000,000 due to delay or purported breaches by Temperatsure of its obligation to supply timely LTM Gross Profit Statements or the Principal Statement; and (5) enforcing the $6,000,000 Principal would result in a windfall to B&C. Temperatsure argues that since the August 2018 Spreadsheet is the Principal Statement, and that statement timely was disputed by B&C, arbitration is required.

In its response to B&C's Complaint, Temperatsure also asserted six affirmative defenses, including that B&C's claims are barred by Smith's unclean hands and by the failure to satisfy a condition precedent. In its third-party complaint, Temperatsure argues Smith breached his contractual and fiduciary duty of loyalty and candor by failing to inform the Board that the Note's procedures were not being followed and by directing Kahle to pay interest that was neither due nor payable.

In his motion, Smith argues he is entitled to summary judgment on Temperatsure's third-party claims because (1) Smith did not have a duty to inform the board that the Note's "procedures" were not being followed, and (2) Smith did not direct Kahle to pay interest.

## ANALYSIS

Summary judgment should be awarded if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[69] Where, as here, the parties have filed cross motions for summary judgment and have not argued an issue of material fact precludes "disposition of either motion, the Court shall deem the motions to be the

---

[69] Super. Ct. Civ. R. 56(c).

16

equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[70]

To determine what document constitutes the Principal Statement, the Court must interpret the Note's plain terms and apply that interpretation to the undisputed facts. The proper construction of a contract is a question of law for the Court.[71] When interpreting a contract, the Court gives priority to the parties' intentions as reflected within the contract's four corners.[72] To determine what the parties intended, "Delaware courts start with the text."[73] The Court must construe the contract "as a whole, giving effect to all provisions therein."[74] Clear and unambiguous language will be given its ordinary meaning.[75]

In Section 2(c), the Note defines Principal Statement as "a statement setting forth [Temperatsure's] calculation of the Principal."[76] Interpreted in accordance with the rules of contract construction, the Note unambiguously provides that a Principal Statement is any statement that sets forth Temperatsure's Principal

---

[70] *Id.* 56(h).

[71] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[72] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) (citing *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113-14 (Del. 1985)); *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996).

[73] *Sunline Com. Carriers, Inc. v. CITGO Petro. Corp.*, 206 A.3d 836, 846 (Del. 2019) (citation omitted).

[74] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (quoting *E.I. du Pont de Nemours and Co.*, 498 A.2d at 1113)).

[75] *Id.* at 780.

[76] Note § 2(c).

calculation. B&C offers the only reasonable interpretation of that phrase, and the July 2017 Email squarely falls within the phrase's meaning.

## A. The July 2017 Email is the Principal Statement under the Note's ordinary meaning.

Under Delaware law, courts give a contract's words their ordinary meaning and do not "torture" those words to impart ambiguity where none exists.[77] Section 2(c) of the Note states:

> **Within** fifteen (15) days after the Evaluation Period, the Company will deliver to the Holder a **statement setting forth** its **calculation** of the Principal to the Holder (the "Principal Statement"). The Holder will have from the time the Principal Statement is delivered to the Holder until 5:00 p.m., Pacific Time, on the fifteenth day after the date of such delivery (the "Dispute Period") to dispute **any** elements of or amounts reflected on the Principal Statement that affect the calculation of the Principal (the "Dispute").[78]

As explained below, the July 2017 Email satisfies each element of this definition.

### i. *"Principal Statement"*

The words the parties used to define "Principal Statement" do not require the statement to have any degree of formality or contain any minimum quantum of data, apart from the figure Temperatsure determined was the Note's Principal. "Statement" ordinarily is defined as "something stated," such as a single declaration

---

[77] *Rhone–Poulenc Basic Chems. Co.*, 616 A.2d at 1196.
[78] Note § 2(c).

or remark, a report of facts, or opinions.[79] "Statement" also is defined as "a summary of activity in a financial account over a particular period of time."[80] Under these definitions, there is no suggestion that a statement must be comprehensive. The email, therefore, can qualify as a statement.

The July 2017 Email is a statement that Temperatsure delivered to B&C that sets forth what Temperatsure calculated the Principal to be. It provides: "The interest payment is being wired today. You should receive $125,000 which is 5 months interest on the note."[81] There is no dispute that $125,000 for five months' interest at the Note's 5% annual rate equals a $6,000,000 Principal.

### ii. "Within"

The term "within" is used as a function word to indicate "before the end of."[82] That meaning supports B&C's interpretation because the email was sent "before the end of" 15 days after the Evaluation Period. "Within" also can be used as a function word to indicate a specified difference or margin, such as "within" a mile of town.[83] Interpreting "within" as meaning "before the end of" is consistent with the parties' intent to structure the Note so the amount of the earn-out promptly was finalized.

---

[79] *Statement*, Merriam-Webster, https://www.merriam-webster.com/dictionary/statement.
[80] *Id.*
[81] B&C Mot., Ex. 28.
[82] *Within*, Merriam-Webster, https://www.merriam-webster.com/dictionary/within.
[83] *See id.*

In contrast, although Temperatsure contends the word "within" prohibits delivery of the statement before the end of the Evaluation Period, that argument is not logical in the context of the parties' agreement. If the maximum payment is reached before the end of the Evaluation Period, there would be no uncertainty left in what was to be paid to B&C and no need to conduct any further evaluation. Indeed, there is no dispute that this is exactly what happened here. Furthermore, no other statement regarding the Principal was sent within 15 days after the Evaluation Period, including the August 2018 Spreadsheet on which Temperatsure relies. Accordingly, focusing on the word "within" adds little to the current dispute, because even Temperatsure's proffered Principal Statement does not fit its interpretation of that word.

### iii.    *"Setting Forth"*

To "set forth" simply is defined as "to give an account or statement of."[84] The July 2017 Email gave such a statement.

### iv.    *"Calculation"*

"Calculation" means "the process or an act of calculating" or "the result of an act of calculating."[85] In choosing which definition should control the meaning of Principal Statement, it is logical to consider how the word is used in other parts of

---

[84] *Set Forth*, Merriam-Webster, https://www.merriam-webster.com/dictionary/set%20forth.
[85] *Calculation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/calculation.

the Note. In Section 2(a), the Note states that "[e]ach LTM Gross Profit Statement will (a) include reasonable supporting documentation for the estimates and calculations contained therein (together with any additional information reasonably requested by the Holder)[.]"[86]

To give meaning to "supporting documentation" for the calculations, it appears that the word "calculation" as used in that section means the end result, rather than a statement with mathematical formulas or processes. Section 2(a)'s very existence also supports the conclusion that the Principal Statement need not state anything more than the amount of Principal. Had the parties intended a Principal Statement to contain supporting calculations, they easily could have included in Section 2(c) language similar to Section 2(a). And, Section 2(a) shows why a Principal Statement would not need to include any level of detail. If Temperatsure was communicating that the maximum possible earn-out had been achieved, there would be no need to include documentation supporting its calculation. Conversely, where the maximum target was not achieved, the LTM Gross Profit Statements would contain all Temperature's figures and formulas.

### v. *"Any"*

Finally, the fact that Section 2(c) requires B&C to "dispute *any* elements of or amounts reflected on the Principal Statement" within 15 days does not mean that

---

[86] Note § 2(a).

the July 2017 Email necessarily required a granular level of detail. Again, when Temperatsure determined that the maximum $6 million earn-out was achieved, it would be absurd to think the parties expected any level of detail since there was nothing for B&C to dispute in those circumstances. The use of the word "any" does not require that there be any elements of or amount reflected on the Principal Statement at all. "Any" means "any part, quantity, or number" and "a or some without reference to quantity or extent."[87] Any could in fact mean none at all.[88]

**B.      Temperatsure's interpretation is not reasonable and the Principal unambiguously is $6,000,000.**

When a contract is clear and unambiguous, the Court accords its terms and provisions their plain meaning.[89] A contract is ambiguous only when a provision is susceptible to more than one interpretation,[90] and not "simply because the parties do not agree upon its proper construction."[91] If the contract is ambiguous, resolving

---

[87] *Any*, Merriam-Webster, https://www.merriam-webster.com/dictionary/any.
[88] *See id.*
[89] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010); *Rhone-Poulenc Basic Chems. Co. v.*, 616 A.2d at 1195 ("Clear and unambiguous language . . . should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it.") (internal citations omitted).
[90] *GMG Capital Invs., LLC*, 36 A.3d at 780 (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (finding an ambiguity exists where "the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings")).
[91] *Id.* at 780 (quoting *Rhone–Poulenc Basic Chems. Co.*, 616 A.2d at 1196).

22

that ambiguity becomes an issue for trial, so that the fact finder may consider extrinsic evidence to construe the contract and determine the parties' intent.[92]

The summary judgment record here precludes a reasonable trier-of-fact from agreeing with Temperatsure's contention that the August 2018 Spreadsheet, rather than the July 2017 Email, is the Principal Statement. Temperatsure's proffered interpretation is contrary to the Note's plain language. Interpreting the Note in that way would deny B&C the benefit of its bargain with Temperatsure, result in superfluous verbiage, negate the earn-out's overall scheme, and lead to absurd results. Because the Note is clear and unambiguous, the Principal is $6,000,000 as stated in the July 2017 Email.

### i. *Temperatsure's interpretation would deny B&C the benefit of its bargain.*

Delaware emphasizes the importance of affording parties the benefit of their bargain when interpreting agreements.[93] Temperatsure argues the July 2017 Email cannot be a Principal Statement because Temperatsure did not (i) first deliver the LTM Gross Profit Statements with supporting information, or (ii) send the "Principal Statement" within 15 days after the Evaluation Period. Temperatsure's counterclaim and affirmative defense similarly posit that the "GAAP-compliant LTM Gross Profit

---

[92] *Id.* at 783 (citing *Eagle Indus., Inc.*, 702 A.2d at 1232; Lawrence M. Solan, *Pernicious Ambiguity in Contracts & Statutes*, 79 Chi-Kent L. Rev. 859, 862 (2004); *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 841-42 (Del. Ch. 2007)).

[93] *SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *11 (Del. Super. Apr. 2, 2003).

statements and delivery of a Principal Statement based on those delivered GAAP-compliant LTM Gross Profit statements was a condition precedent to enforcement of the Note."[94] Those requirements to which Temperatsure points, however, were covenants intended for B&C's benefit, rather than conditions precedent, and their non-performance therefore does not excuse Temperatsure from being bound by its calculation of Principal.

The distinction between a covenant and a condition precedent is that non-occurrence of a covenant, unlike a condition precedent, does not release Temperatsure from its obligation to perform under the Note.[95] Generally, a condition precedent is a term rendering performance by one party contingent upon a condition or performance of another.[96] This condition "must be performed or happen before a duty of immediate performance arises on the promise which the condition

---

[94] *See* Answer at 8.

[95] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *24 n.263 (Del. Ch. Dec. 8, 2017) ("Th[e] distinction between 'condition precedent' and 'covenant' is significant . . . . The press release as a 'condition precedent' would allow Innoviva to walk away from the settlement if Sarissa failed to perform; the press release as 'covenant' would allow Innoviva to sue for breach of contract if Sarissa failed to perform. Non-performance of the 'covenant,' however, would not provide a basis for Innoviva to walk away from the deal (unless, of course, Sarissa committed a material breach of the press release term after the parties engaged in good faith negotiations of the press release language).") (internal citations omitted). *See generally* 2 Farnsworth on Contracts § 8.2 at 415 (3d ed. 2004) ("Although a condition is usually an event of significance to the obligor, this need not be the case. In exercising their freedom of contract the parties are not fettered by any test of materiality or reasonableness. If they agree, they can make even an apparently insignificant event a condition.").

[96] *SLMSoft.Com, Inc.*, 2003 WL 1769770, at *12.

24

qualifies."[97]  Necessarily, whether a condition is one precedent to performance by the other party is divined from the parties' intent.[98]  Courts look to an agreement's terms as evidence of that intent:

> Although no particular words are necessary for the existence of a condition, such terms as 'if,' provided that,' 'on condition that,' or some other phrase that conditions performance usually connote an intent for a condition rather than a promise.  While there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made rather than a condition imposed, so that the terms will be construed as a covenant.[99]

Viewing the Note as a whole, and considering its unambiguous terms, it is evident that the "basic terms and procedures" relied upon by Temperatsure are covenants for B&C's benefit.  As the party in control of Opco, Temperatsure possessed the necessary information to calculate the Principal; the exchange of LTM Gross Profit Statements and the timeframe in which a Principal Statement was required to be delivered were intended to ensure B&C (i) was aware of Opco's performance during the Evaluation Period so it understood how Principal was calculated, and (ii) received its consideration in a timely manner.  Nothing in the

---

[97] 13 Williston on Contracts § 38:7 (4th ed. 2019). *See generally Marvel v. Conte*, 1978 WL 8409, at *4 (Del. Ch. Oct. 24, 1978).

[98] *See* 13 Williston on Contracts § 38.16 (citations omitted).

[99] *Id.* § 38:7; *see also* Restatement (Second) of Contracts § 227 ("Conditions: (1) In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk. (2) Unless the contract is of a type under which only one party generally undertakes duties, when it is doubtful whether (a) a duty is imposed on an obligee that an event occur ... the first interpretation is preferred if the event is within the obligee's control.").

25

Note's language suggests these promises were conditions precedent to Temperatsure delivering a Principal Statement or being bound by a Principal Statement it did deliver. Temperatsure's argument erroneously conflates the Note's covenants with its conditions precedent in an effort to avoid the unavoidable implications of the July 2017 Email.

Even if the GAAP compliance requirement could be construed as a condition precedent imposed for both parties' protection and benefit, both parties effectively waived this condition through their performance under the Note. A condition precedent may be waived by the party for whose benefit the contingency clause was inserted in the contract.[100] And, a condition precedent may be waived by conduct that demonstrates such an intention.[101] Here, B&C's and Temperatsure's conduct evinces such an intent. On July 7, 2017, Temperatsure made the interest payment as promised in the email.[102] On November 3, 2017, the Company paid B&C $75,000 for another quarter's interest consistent with the $6,000,000 Principal.[103] Over the next eight months, each monthly Board packet reported the $6,000,000 Principal expressly.[104] On June 27, 2018, the Company sent a proposed conversion agreement

---

[100] *Nemeth v. Patterson–Schwartz and Assoc., Inc.,* 1987 WL 12444, at *3 (Del. Super. June 12, 1987) (citing 17A C.J.S. Contracts § 491 (1963); 91 C.J.S. Vendor and Purchaser § 110 (1955)).
[101] *Id.*
[102] Smith Decl. ¶ 8.
[103] Answer at 17, ¶ 51; Ex. 11.
[104] *See* Smith Decl. ¶ 19 & Ex. 13.

26

that stated the original principal amount and total accrued interest was $6,075,000.[105] Before August 2018, neither party expressed to the other any dispute with the calculation set forth in the July 2017 Email.[106] Since an acceptable earn-out payment was obtained within the time authorized under the Note, the potential contingency would present no obstacle to enforcing the agreement.

Temperatsure additionally argues the July 2017 Email is not the Principal Statement because (1) Kahle did not intend it to be a Principal Statement, and (2) the email was sent to Smith at his Company email address, not to the address at which B&C was to receive notice under the Note.[107] As to the first argument, Temperatsure contends Kahle's belief that the threshold for the full earn-out had been met was not based on GAAP-compliant LTM Gross Profits Statements for the Evaluation Period. Temperatsure also argues that Kahle only was following Smith's orders as his subordinate and did not actually intend to set forth "the Company's determination of the Principal, if any, owed under the terms of the Promissory Note."[108] Even if all those facts are true, however, Kahle's subjective beliefs and intent at the time he sent the e-mail are irrelevant to whether the July 2017 Email meets the Note's definition of Principal Statement.

---

[105] B&C Mot., Ex. 14 at 14022.
[106] B&C Mot., Ex. 72.
[107] *See* Temperatsure Mot. 6, 23, 27-28.
[108] *Id.* at 23.

27

Similarly, as to Temperatsure's second argument, the email address where the July 2017 Email was sent has no bearing on the Court's analysis.[109] There is no specification in the Note that the Principal Statement must be sent to the notice address for B&C.[110] Even if a Principal Statement is something for which formal "Notice" was required under the Note, in cases where a party has argued a lack of strict compliance with a contractual notice provision, Delaware courts have found substantial compliance with a notice provision where the party "actually transmitted notice to whom it was due."[111] Here, the notice was sent to Smith's email address and there is no dispute that Smith received actual notice. It is clear that the email was sent to Smith in his capacity as B&C's representative. Only B&C was entitled to payments under the Note, and the email Kahle sent to Smith's company address asked "[w]here do you want the interest payments on *your* note to go?" and said "*you* should receive $125,000 which is 5 months interest on the note."[112]

### ii. Temperatsure's interpretation would result in "superfluous verbiage."

Furthermore, Temperatsure's interpretation would result in "superfluous verbiage." When interpreting contracts, this Court construes the contract as a

---

[109] *Id.* at 27-28.

[110] There is a Notice Provision in the Note specifying where formal notice must be sent. *See* Note § 8.

[111] *PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *7 (Del. Ch. Apr. 30, 2018).

[112] B&C Mot., Ex. 28.

whole,[113] "gives meaning to every word in the agreement[,] and avoids interpretations that would result in 'superfluous verbiage.'"[114] Temperatsure's interpretation ignores the "final and binding" language in Section 2(c).

In *Greenstar IH Rep, LLC v. Tutor Perini Corp.*, the Court of Chancery rejected an interpretation almost identical to Temperatsure's.[115] In that case, the defendant argued it was not bound to make earnout payments under a merger agreement because the amounts the defendant disclosed to the plaintiff in tax profit reports were based on inaccurate information.[116] The defendant argued this result was supported by the plain language of the merger agreement in which the earn-out amount was to be based on "pre-tax profits," which in turn were to be based on financials prepared in compliance with GAAP and free of material inaccuracies. Since the amounts disclosed in the pre-tax profit reports did not reflect the actual pre-tax profits, the defendant contended the amounts could not be the basis for the earn-out payments. The Court of Chancery rejected the defendant's interpretation, finding it was contrary to the merger agreement's plain language that the pre-tax profit report was "binding" on both of the parties. The Court stated:

---

[113] *GMG Cap. Invs., LLC*, 36 A.3d at 779 (citing *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113).

[114] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007) (citing *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007)).

[115] 2017 WL 5035567 (Del. Ch. Oct. 31, 2017), *judgment entered*, (Del. Ch. 2017), *aff'd*, 186 A.3d 799 (Del. 2018), *and aff'd*, 186 A.3d 799 (Del. 2018).

[116] *Id.*

The Merger Agreement, at Section 2.14(a), spells out unambiguously how the Earn–Out Payments for each of the five Earn–Out Years are to be calculated. This calculation is expressly dependent upon [Defendant's] calculation of Pre–Tax Profit as disclosed in its Pre–Tax Profit Reports. At Section 2.14(b), the parties evidenced their intent to streamline the Earn–Out Payments by agreeing to a process by which they would settle earn-out related disputes in an expedited and extra-judicial manner. If the parties do not invoke this process, then "[t]he Pre–Tax Profit Report and the Pre–Tax Profit for the twelve-month period reflected [on the report], shall be binding upon the Interest Holder Representative, Stockholders and Parent." Thus, reading Section 2.14(a) and Section 2.14(b) together, the terms unambiguously provide that the Pre–Tax Profits [Defendant] disclosed in its Pre–Tax Profit Reports, having not been disputed, are binding upon both [parties] and the required Earn–Out Payments must be calculated and paid from these amounts. To accept [Defendant's] construction of Section 2.14 would be to render the language "shall be binding" superfluous—a result, under our law, that must be "avoided."[117]

Here, Defendant's arguments similarly would render the Note's "final and binding" language superfluous. Under Section 2 of the Note, Temperatsure must deliver a Principal Statement to B&C. After the Principal Statement is delivered,

[i]f the Holder does not deliver to the Company within the Dispute Period a written notice of the Dispute that sets forth in reasonable detail the elements and amounts of which the Holder disagrees then (i) the Principal Statement and the calculation of the Principal will be deemed to have been accepted and agreed to by the Holder and will be *final and binding* upon the parties; and (ii) the Principal set forth in the Principal Statement will be the Principal for all purposes of this Note, effective as of the first day following the end of the Evaluation Period.[118]

---

[117] *Id.* at *6.
[118] Note § 2(c).

Reading the Note as a whole, Section 2's purpose is to provide B&C with a mechanism by which to dispute Temperatsure's initial calculation. If not disputed within the established timeframes, the Principal Statement and the calculation of the Principal are binding upon both B&C and Temperatsure, and the required earn-out payments must be calculated and paid from these amounts. To accept Temperatsure's interpretation would render the language "will be final and binding" meaningless.

### iii. *Temperatsure's interpretation would negate the earn-out's overall scheme, further denying B&C the benefit of its bargain.*

The basic rule of contract construction gives the parties' intentions priority.[119] In upholding that intention, a court must construe the agreement as whole, giving effect to all its provisions.[120] When interpreting contracts, the meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.[121]

The earn-out contemplated by the parties is typical of earn-outs in corporate acquisitions. In a highly complex corporate transaction, an earn-out allows parties

---

[119] *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939); *see also Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3d Cir. 1982); *DuPont v. Wilmington Trust Co.*, 45 A.2d 510 (Del. Ch. 1946); Restatement (Second) of Contracts § 202.
[120] *Radio Corp. of Am.*, 6 A.2d at 340.
[121] *GMG Cap. Invs., LLC*, 36 A.3d at 779 (citing *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113).

to bridge a valuation gap that may arise during their negotiations.[122] An earn-out provision creates a contingent payment obligation for the acquirer that becomes payable if certain targets are met during the post-closing period.[123] Through the contingent payment structure of an earn-out, the parties agree to defer the ultimate valuation question until a later time when uncertainties with respect to valuation have been resolved.[124] An earn-out does not, however, give the acquirer license continually to revisit the valuation question once the contractual time to do so has passed.

Recognizing this reality, the Court of Chancery in *Greenstar* rejected the defendant's argument that it could avoid its payment obligation because the pre-tax profits it previously calculated and delivered were based on financial statements that were not GAAP compliant:

> Nothing in the Definitions Section reasonably can be read to negate or qualify Section 2.14's mandate that if [Plaintiff] does not object within thirty days of receiving a Pre–Tax Profit Report, the report and the Pre–Tax Profit stated therein are binding on all parties. Instead, the Definitions Section simply defines how [Defendant] must calculate Pre–Tax Profit—it must do so "in accordance with past practices and based upon financial statements (prepared in accordance with GAAP consistently applied) of the [Defendant]." Section 2.14 makes no reference to this Definition, nor do the express terms of the provision even hint that the parties intended to relieve [Defendant] of its earn-out obligations in the event [Defendant] is later able to demonstrate that it

---

[122] Brian JM Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127, 134 (2012).
[123] *Id.* at 133.
[124] *Id.*

failed properly to calculate Pre–Tax Profit by relying on inaccurate financial statements that it prepared. What Section 2.14 does make clear is that once [Defendant] prepares the Pre–Tax Profit Report, and provides it to [Plaintiff], if [Plaintiff] does not timely object, the report and the Pre–Tax Profit disclosed therein are "binding."[125]

\* \* \*

Had the parties intended to allow [Defendant] to withhold Earn–Out Payments whenever it believed it had calculated Pre–Tax Profits based on inaccurate information, they easily could (and surely would) have provided such language as part of the bespoke process they agreed to in Section 2.14. They did not. Therefore, I will not imply a term that is inconsistent with the intent of the parties as evidenced by the express terms of the agreement.[126]

In a similar manner to the defendant in *Greenstar*, Temperatsure argues the July 2017 Email cannot be a Principal Statement because the Note's "basic terms and procedures"[127] were not followed, and Temperatsure therefore could not at the time it sent the email have made a final determination of the Note's Principal amount. Temperatsure contends this result is supported by the Note's plain language, which states that the Principal has to be based on the LTM Gross Profit.

The parties agreed to base the contingent payment on Opco's LTM Gross Profits calculated over the seven-month Evaluation Period. If Opco achieved the target in any one of those months, the contingent payment would be due and the parties' valuation differences would be resolved. Accordingly, at the point that

[125] *GreenStar IH Rep, LLC*, 2017 WL 5035567, at *7.
[126] *Id.* at *8.
[127] Temperatsure Mot. at 2.

Kahle notified Smith that the maximum payout had been reached, the valuation uncertainty appeared resolved to both parties. All that remained was to fulfill the Note's payment obligations. It was not until a year later that Temperatsure purportedly recognized its mistaken calculation and sent the August 2018 Spreadsheet as the Principal Statement under the Note. Temperatsure's position that the August 2018 Spreadsheet constitutes the Principal Statement, however, disregards the Note's other fundamental provisions regarding finality of the determination and therefore contravenes the parties' clear intentions. To hold otherwise would negate the earn-out's overall scheme.

Just as in *Greenstar*, the definition of LTM Gross Profit cannot be read to negate or qualify Section 2's mandate that if B&C does not object within the Dispute Period, the Principal Statement and its Principal calculation will be binding. The definition of LTM Gross Profit describes how Temperatsure must calculate the Principal in accordance with GAAP. Section 2 makes no reference to this definition, nor do the provision's express terms relieve Temperatsure of its earn-out obligations in the event it failed to calculate the Principal properly. Rather, Section 2 defines the Principal Statement as Temperatsure's statement setting forth *its* calculation. It was anticipated through the dispute resolution process that the initial calculation, even if incorrect, still would become the Principal if B&C failed to dispute it.

Temperatsure essentially has argued that its miscalculations and failure to fulfill its obligations should be reinterpreted as though Temperatsure never sent a Principal Statement until August 2018.[128] The parties did not, however, negotiate a mechanism by which Temperatsure could retreat from a Principal calculation it later concluded was erroneous. Temperatsure's understanding is contrary to the benefits contemplated by the agreement, where both parties benefited from a provision that limited the time to dispute the Principal.

### iv. Temperatsure's interpretation would lead to absurd results.

The general absurdity of Temperatsure's position requires little further analysis. Considered purely from a logical standpoint, Temperatsure's argument would require the Court to conclude: (1) Temperatsure's previous calculation of Principal, on which both sides relied from a period of 13 months, was meaningless because Temperatsure did not comply with its own obligations (a) to provide monthly statements of its gross profit, or (b) calculate gross profit according to GAAP; and (2) B&C was required to demand Temperatsure perform its obligations and B&C's failure to do so imperils its earn-out, even though B&C had no reason to insist upon strict compliance once the full earn-out was achieved. The Court simply is not persuaded that sophisticated parties are required to behave irrationally.

---

[128] Under this counterfactual reality, B&C apparently raised no objection to the absence of any Principal Statement and blindly accepted interest payments without knowing what they represented.

35

Section 2 makes clear that once Temperatsure delivers the Principal Statement and B&C does not timely object, the Principal disclosed is binding. Even Temperatsure acknowledges that the Note deems an undisputed Principal Statement "final and binding."[129] As such, B&C is entitled to summary judgment on its claims unless the Company can establish at least a triable factual issue as to one or more of its affirmative defenses.[130] The only remaining affirmative defense the Company raises in its answering brief is that Smith breached his duties of loyalty and candor, which, as detailed below, is unconvincing. As such, B&C is entitled to a declaration that the Principal is $6,000,000. Because B&C was entitled to the interest payment it received, Temperatsure's counterclaim that B&C unjustly was enriched similarly fails.

## C.    Smith did not breach his duties of loyalty and candor.[131]

There is no dispute that Smith, as a Temperatsure board member, owed the Company fiduciary duties. Temperatsure contends Smith breached his duties in accepting an interest payment on B&C's behalf that was not yet technically due and by failing to advise Temperatsure's board that Temperatsure was not providing LTM Gross Profit Statements.

---

[129] *See, e.g.* Temperatsure Mot. at 3.

[130] *See Scureman v. Judge*, 626 A.2d 5, 14 (Del. Ch. 1992), *aff'd sub nom., Wilmington Tr. Co. v. Judge*, 628 A.2d 85 (Del. 1993).

[131] The undersigned was designated to sit as Vice Chancellor on the Court of Chancery "for the purpose of hearing equitable claims or defenses" by Chief Justice Leo E. Strine, Jr. on June 27, 2019.

36

Temperatsure first argues Smith breached his fiduciary duty of loyalty by "directing a subordinate to pay interest that was not due or payable."[132] It is plain from the record (and acknowledged by all parties) that everyone misinterpreted the Note's interest provision. Section 3 of the Note states that interest "accru[es] from the date on which the Principal is finally determined to be any amount greater than $0 pursuant to Section 2."[133] Under Section 2(c), the Principal could not become final and binding until at least 15 days elapsed following delivery of the Principal Statement without B&C sending Temperatsure a Dispute Notice.[134] Accordingly, interest could not have accrued until 15 days after Kahle's July 2017 Email. Despite that language, on February 3, 2017, in a response to a question from Temperatsure's auditors about how Temperatsure should value the Note on its 2016 financial statements, Fry stated to the auditors and Kahle: "I think at this point it's very likely that [the $6,000,000 earn-out] will be earned and we're happy to accrue accordingly . . . ."[135]

Based on his understanding of this statement, Kahle directed then Controller Mary Stoltenberg to accrue a monthly $25,000 interest obligation beginning with the month of February 2017.[136] There is no showing that Smith realized Kahle's

---

[132] *See* Temperatsure Mot. at 45-47.
[133] Note § 3.
[134] *Id.* § 2(c).
[135] B&C Mot., Ex. 16 at 7964.
[136] Kahle Dep. at 129:6-131:13; B&C Mot., Ex. 29.

interpretation was incorrect. In fact, each Temperatsure board member, including Smith, failed to notice the early accrual and payment.[137] Even the August 2018 Spreadsheet that Temperatsure argues is its definitive statement of Principal under the Note indicates that interest began accruing in the first quarter of 2017.[138]

Notwithstanding these undisputed facts, Temperatsure cites Smith's June 28, 2017 email as evidence of Smith's disloyalty. That email stated: "Obviously I am not to[o] worried about it but you should plan on paying my Qtrly Note Payment in July sometime unless you want to do in June." Even if this could be interpreted as a direction, it is undisputed that Smith and Kahle already had discussed the Principal, and Kahle directed the controller to pay the interest even before the email was sent.[139] Smith's request that Temperatsure begin paying interest that both sides mistakenly believed was due cannot be construed as disloyal behavior.

As to its argument that Smith breached his duty of candor by failing to advise the Board that Temperatsure was breaching its obligation to provide LTM Gross Profit Statements to B&C during the Evaluation Period, neither the facts nor Delaware case law supports Temperatsure's position. Under the facts as Smith knew them, B&C achieved the maximum earn-out within the first month of the Evaluation

---

[137] *See, e.g.*, B&C Mot., Ex. 11 (Fry, Bell, and Silva Behrens discussing in May 2018 that by March 2018, that Temperatsure "should have paid a total of $350K in interest [i.e., 14 months' worth] since inception").

[138] *See* B&C Mot., Ex. 72 at 48884 (stating that 6 quarters of interest had accrued as of August 6, 2018).

[139] *See* B&C Mot. at 36 (discussing Ex. 65).

Period. B&C therefore would have no reason to insist that Temperatsure provide the monthly statements at issue. Without any facts suggesting that Smith knew Kahle was not following GAAP or otherwise was miscalculating the Principal amount, there is no plausible argument that Smith acted disloyally or with incomplete candor by failing to alert Temperatsure's board to this technical violation of the Note.

## **CONCLUSION**

For the foregoing reasons, Temperatsure's Motion for Summary Judgment is **DENIED**, and B&C's and Smith's Motions for Summary Judgment are **GRANTED**. B&C and Smith shall submit a conforming form of order within fifteen days reflecting the amount of principal and interest due under the Note. Before filing, B&C shall afford Temperatsure a meaningful opportunity to review and respond to the proposed order. If the parties disagree as to the order's contents, B&C shall so advise the Court by a letter accompanying the proposed order. Temperatsure then may file a responsive letter within five business days. **IT IS SO ORDERED.**